**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 15-0655-WS-N** |
| | ) | |
| **JAMES M. CRUMB, M.D.,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter comes before the Court on the Motion to Dismiss Amended Complaint (doc. 49) filed by defendants James Crumb, M.D. and Mobility Metabolism & Wellness PC, and on the Motion to Dismiss Amended Complaint (doc. 51) filed by defendant Coastal Neurological Institute, P.C. Both Motions have been exhaustively briefed and are now ripe.[1]

**I.    The Amended Complaint.**

**A.    *Claims and Parties.***

The Government brought this action against a physician, the professional corporation he formed, and his former employer alleging that they engaged in several fraudulent billing schemes

---

[1]    Also pending is the Government's Motion for Leave to File Amended Consolidated Response (doc. 82). In that Motion, the Government seeks leave to substitute an Amended Consolidated Response (doc. 82-3) for its original Consolidated Response (doc. 78) to correct several minor "factual and editorial mistakes." For cause shown and in the absence of any conceivable prejudice to defendants, the Motion for Leave to File Amended Consolidated Response is **granted**. The Amended Consolidated Response (doc. 82-3) will be considered herein, and will be deemed to supersede and supplant its predecessor (doc. 78) in all respects. Additionally, the Court observes that defendants Crumb and MMW have requested oral argument on their Motion to Dismiss. The Local Rules provide that "[i]n its discretion, the Court may rule on any motion without oral argument." Civil L.R. 7(h). After careful consideration of that request, and review of the more than 135 pages of briefing the parties have collectively submitted to debate the adequacy of the 69-page Amended Complaint, the undersigned is of the opinion that oral argument would not be helpful in adjudicating these Rule 12(b)(6) Motions; therefore, the Court exercises its discretion to **deny** defendants' request for oral argument.

against federal health care programs. The Amended Complaint identifies three categories of purportedly fraudulent activities by defendants, to-wit: (i) "knowingly submitting, or causing to be submitted, false or fraudulent claims to federal health care programs;" (ii) "knowingly making or using false statements or records material to false or fraudulent claims paid by the United States;" and (iii) "knowingly concealing or improperly avoiding or decreasing an obligation to pay or transmit money or property to the United States." (Doc. 34, ¶ 5.) Based on this allegedly fraudulent conduct, the Amended Complaint asserts causes of action against defendants for submission of false claims, in violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1) and 3729(a)(1)(A); use of false records and statements material to false or fraudulent claims, in violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(2) and 3729(a)(1)(B);[2] concealment or avoidance of obligation to pay money to the United States, in violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1) and 3729(a)(1)(G); and common-law claims for payment under mistake of fact and unjust enrichment.

The Government has packaged these three False Claims Act ("FCA") and two common-law claims in an Amended Complaint spanning 69 pages and 307 numbered paragraphs, with nearly 300 pages of accompanying exhibits (consisting mostly of spreadsheets with detailed claims data filed under seal because they contain names and medical information for patients as to whom defendants purportedly made false claims for reimbursement). Defendants maintain that the Amended Complaint should be dismissed as inadequately pleaded pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. Because the sufficiency of the allegations of the Amended Complaint is central to both Motions to Dismiss, it is helpful at the outset to summarize that pleading.[3]

---

[2]     As amended by Congress on May 20, 2009, the False Claims Act imposes liability on "any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1).

[3]     To be clear, this summary is not to be construed as a formal or definitive recitation of findings of fact; rather, the Court is fulfilling its obligation to "accept[] the facts alleged in the complaint as true" and "draw[] all reasonable inferences in the plaintiff's favor." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010); *see also McNutt ex rel. United States v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) (on a motion to dismiss for failure to state a claim, courts "view the allegations of the complaint in the light most (Continued)

Defendant James M. Crumb, M.D. ("Dr. Crumb") is a licensed Alabama physician specializing in Physical Medicine and Rehabilitation ("PM&R"). (Doc. 34, ¶ 16.) From 2002 through June 2011, Dr. Crumb practiced medicine as an employee of defendant Coastal Neurological Institute, P.C. ("CNI"). (*Id.*) During this time period, Dr. Crumb was one of a number of PM&R physicians employed by CNI, including (among others) non-parties Dr. Edward M. Schnitzer and Dr. Regina Phillips Gilliland. (*Id.*, ¶ 73.) In 2010, CNI elected not to renew Dr. Crumb's contract. (*Id.*, ¶ 79.) Effective July 1, 2011, after parting ways with CNI, Dr. Crumb conducted his medical practice under the banner of defendant Mobility Metabolism & Wellness, P.C. ("MMW"), an Alabama professional corporation as to which he is the sole shareholder and owner. (*Id.*, ¶¶ 16-17, 80.) CNI continued to assist Dr. Crumb and MMW with billings and collections from July 2011 through mid-2013, and Dr. Crumb leased office space from CNI and used CNI's electronic charting and billing system for at least part of that time. (*Id.*, ¶¶ 80-83.)

### B.   *Knowing Falsification of Diagnoses.*

The first fraudulent billing practice identified in the Amended Complaint is that defendants "knowingly submitted false claims for Botox injections procedures and ultrasound guidance using false diagnoses of uncommon and rare neurological disorders, Spasmodic Torticollis and/or Genetic Torsion Dystonia, solely to create a covered and payable claim." (Doc. 34, at 21.) The Government's position is that Dr. Crumb "falsif[ied] diagnoses on hundreds and hundreds of patient medical charts to create covered claims." (*Id.*, ¶ 256.)

The fraudulent practice worked like this: Government health insurers (including Medicare, Alabama Medicaid, and TRICARE) provide reimbursement of claims for Botox

---

favorable to the plaintiff[], consider the allegations of the complaint as true, and accept all reasonable inferences therefrom") (citation omitted); *Family Medicine Pharmacy, LLC v. Perfumania Holdings, Inc.*, 2016 WL 3676601, *9 (S.D. Ala. July 5, 2016) ("For purposes of this Rule 12(b)(6) analysis, the Court accepts as true all well-pleaded factual allegations of the Amended Complaint, and draws all reasonable inferences in [non-movant]'s favor."). In the interests of efficiency, this section of the Order will largely omit the typical cumbersome qualifiers (*i.e.*, "according to the Amended Complaint," "the Government alleges," and so on), and simply set forth those facts as pleaded. Again, such a formulation is to be neither equated with judicial fact-finding nor perceived as an indication that the Court has any opinion of what the facts ultimately proven at trial will be.

treatments for diagnoses of Cervical Dystonia ("ST") or Genetic Torsion Dystonia ("GTD"), which are described in the pleadings as "rare," an "uncommon diagnosis," and a "rare and disabling disorder." (*Id.*, ¶¶ 85-86, 88.)[4] From 2007 through 2013, "Dr. Crumb implemented a fraudulent Botox injection procedure scheme" whereby his "decision to perform these Botox injection procedures pre-determined the patient's diagnosis of either ST or GTD." (*Id.*, ¶ 110.) Thus, Dr. Crumb "diagnosed hundreds and hundreds of patients with ST" even though "numerous medical reviews" of medical charts did not reveal patient symptoms that would accompany that diagnosis. (*Id.*, ¶ 87.) And he "submitted over 2,000 claims to Medicare, Medicaid and TRICARE specifically for the treatment of low back pain with Botox injections and assigned a diagnosis of GTD or Idiopathic Dystonia," despite the absence of medical records showing that Dr. Crumb ordered genetic testing or even took a family history relating to dystonia that might have supported a diagnosis of GTD. (*Id.*, ¶ 89, 92.)

Part of this fraudulent practice was that Dr. Crumb "misrepresent[ed] patients' medical systems and true medical conditions using cloned and inaccurate information in hundreds and hundreds of medical charts." (*Id.*, ¶ 256.) Dr. Crumb has acknowledged creating cloned language in patient charts "to describe his patient[']s condition with a ST diagnos[i]s," "to describe the patients' symptoms" and "to document his patient assessment." (*Id.*, ¶¶ 93-99.) Such cloned language was false because it did not document "the true condition of the patient." (*Id.*, ¶ 100.) Review of CNI and MMW medical records reflects that Dr. Crumb "used the above referenced cloned language more than 275 times." (*Id.*, ¶ 106.) Many of those patients were also treated by other physicians "who did not diagnose, treat, or even reference ST or GTD," and of 20 such patients interviewed during the Government's investigation, "none were aware that Dr. Crumb diagnosed them with rare neurological movement disorders," or had even heard of those diagnoses. (*Id.*, ¶¶ 107-08.) From January 2007 through June 2011, Dr. Crumb administered roughly 350 Botox procedures on Medicare beneficiaries, of which 338 were for patients to whom he had assigned a diagnosis of ST or GTD. (*Id.*, ¶ 114.)

---

[4]     Dystonia is identified as "a rare neurological movement disorder in which a person's muscles contract uncontrollably causing affected body part to twist involuntarily." (*Id.*, ¶ 85.) ST is characterized by "involuntary, sustained, patterned, and often repetitive muscle contractions of opposing muscles in the neck regions." (*Id.*, ¶ 86.) And GTD is a form of dystonia "believed to be inherited and caused by a mutation in the gene DYT1." (*Id.*, ¶ 88.)

Pursuant to this scheme, Dr. Crumb, MMW and CNI are alleged to have "knowingly submitted false claims to Medicare, Medicaid, and TRICARE … for Botox injection procedures and multiple units of ultrasound guidance for the treatment of false diagnoses." (*Id.*, ¶¶ 117-18.) The false diagnoses of ST or GTD were critical to the fraudulent submissions; indeed, without them defendants' "claim submissions for Botox injection procedures and ultrasound guidance would be denied as a non-covered claim." (*Id.*, ¶ 119.) "Because the ST and GTD diagnoses are false, all claims that CNI and/or MMW submitted ... for reimbursement for the treatment of these diagnoses are not covered and payable claims, and thus constitute false claims under the FCA." (*Id.*, ¶ 261.)

## C. *Knowing Abuse of Coding Modifiers.*

Another fraudulent billing scheme identified in the Amended Complaint relates to abuse of coding modifiers to inflate reimbursement amounts. A code modifier 76 indicates that a procedure was repeated "subsequent to and/or unrelated to the original procedure or service." (Doc. 34, ¶ 122.) Billing and reimbursement policy promulgated by the Centers for Medicare & Medicaid Services ("CMS") reflects that, for ultrasound guidance, only "one unit of service" is allowed "at a single patient encounter regardless of the number of needle placements performed." (*Id.*, ¶ 121.) But defendants abused the 76 modifier by, in one specific example, using it to bill Medicare 32 separate times for a single patient encounter. (*Id.*, ¶¶ 123-24.) Such a practice was not only contrary to CMS policy, but it was also fraudulent because those 32 units of service were not actually provided to the subject patient. Thus, "CNI knowingly created and submitted hundreds and hundreds of false claims … for multiple units of ultrasound guidance that were not rendered." (*Id.*, ¶ 269.)

Similarly, a code modifier 25 "represents a significant, separately identifiable evaluation and management (E&M) service by the same physician on the same day of the procedure," enabling the provider to recoup an additional fee for that additional E&M service. (*Id.*, ¶¶ 170, 172.) Defendants "engag[ed] in a policy and practice of adding modifier 25 to [E&M] CPT codes on the same day injection procedures such as Botox and trigger point injections were performed." (*Id.*, ¶ 169.)[5] Dr. Crumb "fraudulently assigned a different diagnosis … in an

_____

[5]    A CPT code is described as a "Current Procedural Terminology Code," a five-digit code identifying the services or procedures performed on the patient for whom (Continued)

attempt to support the addition of a 25 modifier," thereby "overstating the services provided to the patient" and resulting in overpayment by the Government. (*Id.*, ¶¶ 173-76.)

### D. Knowing Billing of Medically Unnecessary Services.

The third fraudulent billing scheme identified in the Amended Complaint is that when Dr. Crumb began phasing out his Botox practice in 2011, he began a new practice of "billing Medicare for ultrasound guidance with a routine blood draw," thereby converting (for example) a $3.00 reimbursement for a blood draw into a reimbursed ultrasound claim of $150.77. (Doc. 34, ¶¶ 12-29.) Data shows that Dr. Crumb went from making zero claims to Medicare or Alabama Medicaid for ultrasound guidance in connection with blood draws in 2010, to making hundreds of such claims in years 2011 through 2014, reaching a highwater mark of 1,198 such claims in 2012. (*Id.*, ¶ 128.) The Government states that "the use of ultrasound guidance with routine blood draws is not the accepted standard of medical care, not reasonable, and not medically necessary." (*Id.*, ¶ 131.) To justify these billings, Dr. Crumb used preprinted forms with criteria such as "patient afraid of needles" or "patient states veins collapse," none of which are adequate to show that the use of ultrasound guidance for such a routine procedure is "reasonable or medically necessary for the treatment of the patient." (*Id.*, ¶ 133.) Defendants' "sole purpose" for using this procedure was "to fraudulently increase reimbursements." (*Id.*, ¶ 134.)

Defendants' performance of medically unnecessary services and procedures also extended to "ultrasound guidance for needle placement … for almost all Botox and Trigger point injections that they performed." (*Id.*, ¶ 137.) Use of ultrasound guidance in those circumstances "is not the established standard of care and routinely does not provide clinical value," except in certain particular situations (*i.e.*, "where the guidance is necessary to guide the needle around a structure" or "medical necessity is adequately reflected in the patient's medical chart"). (*Id.*, ¶¶ 138-40.) Certain "medical professionals" reviewing CNI and MMW patient files found that defendants' chart documentation as to those ultrasound guidance procedures was insufficient in specifically enumerated ways. (*Id.*, ¶¶ 142-48.)

---

reimbursement is sought. (*Id.*, ¶ 39.) A CPT code must be accompanied by a supporting diagnosis code in order to give rise to a reimbursable claim. (*Id.*)

### E. Avoidance of Obligations to the Government.

The Amended Complaint alleges facts to support defendants' liability on an additional theory of "[f]ailure to return to the federal government any overpayment received from either Medicare or Alabama Medicaid." (Doc. 34, ¶ 179.) This is a so-called "reverse false claim." Defendants had "actual knowledge" for several years of improper 76 modifier claims, "were reckless in failing to scrutinize and audit Dr. Crumb's Botox practice," and "did not take any steps to identify and return" overpayments received because of improper 76 modifiers, but instead "knowingly continued with the same course of conduct." (*Id.*, ¶¶ 180-81.) Even after being notified in September 2014 of the Government's False Claims Act investigation, "CNI did not conduct a self-audit, investigate, or inquire into whether" any of the subject reimbursement claims might necessitate repayment. (*Id.*, ¶ 184.) And Dr. Crumb and MMW "failed to take any corrective or repayment action." (*Id.*, ¶ 185.) Defendants have made "recent partial payment" of overpayments for false and fraudulent claims; however, they did not do so within 60 days, but instead delayed for years from the time they were first placed on notice. (*Id.*, ¶¶ 187-89.)

### F. Knowledge.

The Amended Complaint pleads knowledge by defendants taking various forms. The overarching theme is that "CNI and Dr. Crumb/MMW knew that they were submitting claims or causing the submission of claims to Medicare, Alabama Medicaid, TRICARE, and other federal health care programs in violation of the FCA." (Doc. 34, ¶ 191.) In that regard, CNI failed to "provide specific PM&R coding and billing training" to its billing personnel during the relevant time period, and denied these employees "access to critical updates, guidelines and regulations." (*Id.*, ¶¶ 195, 201.) Defendants "failed to read and monitor published" Medicare updates, alerts and notifications, and "deliberately ignored program guidelines and instructions that were received." (*Id.*, ¶ 204.) When CNI learned in 2007 that using the 76 modifier would bypass Medicare's denial of claims as duplicate billings, CNI and Dr. Crumb "began appending modifier 76 to almost all 76942 billings, and thus increased reimbursement to which CNI and Dr. Crumb/MMW were not entitled." (*Id.*, ¶¶ 209-10.)[6] When CNI billing personnel expressed

---

[6] The term "76942 billings" is a reference to the CPT code for ultrasound guidance, which as a matter of CMS policy was limited to one unit of service per patient encounter. Defendants circumvented the one-unit billing limit via improper, false use of the 76 modifier.

concern about the propriety of this practice, CNI's Chief Administrative Officer, Jerry Golden, "instructed billing personnel to continue billing multiple units of 76942 using modifier 76." (*Id.*, ¶ 212.)

Despite written notification by program authorities and private payers alike that this practice was improper, CNI persisted until late 2010 or early 2011, when it finally instructed its physicians and billing personnel no longer to use modifier 76 with CPT Code 76942. (*Id.*, ¶¶ 214-21.) Yet CNI employees, including Dr. Crumb, "continued to chart multiple units of ultrasound guidance, and CNI continued to bill multiple units," with Dr. Crumb carrying on with that practice until October 2014. (*Id.*, ¶¶ 222-23.) CNI knew that Dr. Crumb was making "large orders of a very expensive, diagnosis restricted medication" (Botox), but did not investigate or question it. (*Id.*, ¶ 228.) CNI also knew of audits and investigations for "Dr. Crumb's excessive billing of Botox injections, multiple units of ultrasound guidance for needle placement, and ultrasound guidance used with routine blood draws," yet its "billing department continued to assist with the submission of claims" for him even after he left CNI's employ and started MMW. (*Id.*, ¶¶ 231-32.) And during relevant times, Dr. Crumb was "providing services to patients as a part of his[] duties as a CNI physician," while "CNI directly received funds from claims submitted" by Dr. Crumb and others "for medically unnecessary Botox injections and ultrasound guidance for needle placement." (*Id.*, ¶¶ 235-37.)

> ### G. *Causes of Action.*

Based on these and numerous other factual allegations, the Government asserts five claims for relief against defendants, including three under the False Claims Act and two common-law claims. The first FCA claim, labeled "Submission of False Claims" and asserted pursuant to 31 U.S.C. § 3729(a)(1), alleges that defendants presented "false or fraudulent claims for payment or approval to the United States, acting through its federal health care programs, … for Botox injections procedures and ultrasound guidance for needle placement (with and without modifier 76), on patients who did not suffer from ST and/or GTD." (Doc. 34, ¶¶ 286-87.) That claim also alleges that defendants presented false or fraudulent claims "for multiple unit billing of CPT Code 76942 with modifier 76, unreasonable and medically unnecessary services, procedures, and medications; up-coded 25 and 76 modifier procedures, services not rendered, and medication not administered." (*Id.*, ¶ 288.)

The second FCA cause of action, labeled "Use of False Records and Statements" and asserted pursuant to 31 U.S.C. § 3729(a)(2), alleges that defendants falsified "patient diagnoses of ST and/or GTD in CNI and MMW medical charts, on Form 1500 for claims submissions, and in the Medicaid certifications for medication overrides, and representations made and caused to be made … to get false or fraudulent claims paid and approved by the United States. Those false records or statements were material to false or fraudulent claims." (*Id.*, ¶ 291.)

The Government's third FCA cause action, labeled "Concealing or Avoiding Obligation to Pay" and asserted pursuant to 31 U.S.C. § 3729(a)(1), alleges that defendants "made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States." (*Id.*, ¶ 294.) That claim includes further allegations that "[s]aid concealment, avoidance or decreased obligation to pay or transmit money to the United States was made with actual knowledge, or with reckless disregard or deliberate indifference." (*Id.*, ¶ 296.)

Finally, the two common-law claims found at Counts IV and V of the Amended Complaint sound in theories of "Payment Under Mistake of Fact" and "Unjust Enrichment." The first of those causes of action alleges that the Government is entitled to recover monies paid to defendants through Medicare, Alabama Medicaid and TRICARE reimbursements "as a result of mistaken understandings of facts." (*Id.*, ¶ 299.) The Amended Complaint alleges that the Government paid defendants' claims for reimbursement from federal health care programs "based upon mistaken or erroneous understandings of material fact caused by CNI and Dr. Crumb/MMW." (*Id.,* ¶ 300.) As for the unjust enrichment cause of action, the Amended Complaint specifies that "[b]y directly and indirectly obtaining government funds to which they were not entitled, CNI and Dr. Crumb/MMW were unjustly enriched, and are liable to account and pay such amounts" to the Government. (*Id.*, ¶ 304.)

## II. Applicable Legal Standards.

Defendants move for dismissal of the Amended Complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim on which relief will be granted. In particular, defendants repeatedly and vigorously contest the sufficiency of the Government's pleading to state actionable claims against them under applicable pleading standards.

Ordinarily, to withstand Rule 12(b)(6) scrutiny and satisfy Rule 8(a), a plaintiff must merely plead "enough facts to state a claim to relief that is plausible on its face," so as to nudge[] [its] claims across the line from conceivable to plausible." *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). "This necessarily requires that a plaintiff include factual allegations for each essential element of his or her claim." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1254 (11th Cir. 2012). Thus, minimum pleading standards "require[] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. As the Eleventh Circuit has explained, *Twombly / Iqbal* principles require that a complaint's allegations be "enough to raise a right to relief above the speculative level." *Speaker v. U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention*, 623 F.3d 1371, 1380 (11th Cir. 2010) (citations omitted). "To survive a Rule 12(b)(6) motion to dismiss, the complaint does not need detailed factual allegations … but must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010) (citations and internal quotation marks omitted).

Notwithstanding this general pleading standard, the parties correctly recognize that the heightened pleading standard of Rule 9(b) also applies to the Government's FCA claims. *See, e.g., Hopper v. Solvay Pharmaceuticals, Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) ("[a] complaint under the False Claims Act must meet the heightened pleading standard of Rule 9(b)"); *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301 (11th Cir. 2002) ("we now make clear that Rule 9(b) does apply to actions under the False Claims Act"). "A False Claims Act complaint satisfies Rule 9(b) if it sets forth facts as to time, place, and substance of defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper*, 588 F.3d at 1324 (citations and internal quotation marks omitted).[7] "If Rule

---

[7] Significant public policies undergird this heightened pleading requirement in fraud actions such as this one. *See United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006) (absent particularized pleading, a plaintiff may "learn the complaint's bare essentials through discovery and may needlessly harm a defendant's goodwill and reputation by (Continued)

9(b) is to carry any water, it must mean that an essential allegation and circumstance of fraudulent conduct cannot be alleged in … conclusory fashion." *Clausen*, 290 F.3d at 1313.

Of course, the Rule 9(b) particularity requirement "must be read in conjunction with Federal Rule of Civil Procedure 8's directives that a complaint need only provide a short and plain statement of the claim," and courts considering motions to dismiss for failure to plead fraud with particularity "should always be careful to harmonize the directives of [R]ule 9(b) with the broader policy of notice pleading found in Rule 8." *Hill v. Morehouse Medical Associates, Inc.*, 2003 WL 22019936, *3 (11ᵗʰ Cir. Aug. 15, 2003) (citations and internal quotation marks omitted). In other words, the two pleading standards are considered together, such that "[i]n an action under the False Claims Act, Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b)." *Urquilla-Diaz v. Kaplan University*, 780 F.3d 1039, 1051 (11ᵗʰ Cir. 2015).[8] The objective of Rule 9(b) is to "alert[] defendants to the precise misconduct with which they are charged and protect[] defendants against spurious charges." *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11ᵗʰ Cir. 2012) (citation omitted).

For the Government's FCA claim brought pursuant to 31 U.S.C. § 3729(a)(1) on a theory of presentment of a false or fraudulent claim, binding precedent mandates that "actual presentment of a claim be pled with particularity," meaning "the who, what, where, when, and how of fraudulent submissions to the government." *Hopper*, 588 F.3d at 1327 (citation and internal quotation marks omitted); *see also United States ex rel. Mastej v. Health Management Associates, Inc.*, 591 Fed.Appx. 693, 703-04 (11ᵗʰ Cir. Oct. 30, 2014) (to satisfy Rule 9(b) in FCA context, plaintiff "must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the

---

bringing a suit that is, at best, missing some of its core underpinnings") (citation omitted); *Clausen*, 290 F.3d at 1310 ("The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior.") (citation omitted).

[8]     In light of the Eleventh Circuit's clear explanation that Rule 8 is supplemented by Rule 9(b) – and not supplanted by it – in the FCA context, the Court does not adopt CNI's arguments that Rule 9(b) provides the sole governing pleading standard here and that the Government's references to Rule 8 plausibility are misguided and erroneous. (*See* doc. 84, at 1.)

defendants obtained as a result") (citation omitted). Simply put, "if Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (citation omitted). Federal courts "evaluate whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Id.* at 1358. The Eleventh Circuit has championed a "nuanced, case-by-case approach" for examining whether the requisite indicia of reliability are present; therefore, "there are no bright-line rules" in this inquiry. *Mastej*, 591 Fed.Appx. at 704.[9]

As to the Government's FCA claim brought pursuant to § 3729(a)(2) on a theory of use of false records and statements, the Complaint "must allege with particularity, pursuant to Rule 9(b), that [defendants'] false statements ultimately led the government to pay amounts it did not owe." *Hopper*, 588 F.3d at 1329. Indeed, to state a claim under this subsection, "a plaintiff must show that (1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statement caused the government to actually pay a false claim." *Urquilla-Diaz*, 780 F.3d at 1052 (citation omitted).

For the reverse false claim pleaded as Count III of the Amended Complaint, the applicable legal standard depends on whether the claims are brought under the version of the False Claims Act that predated the Fraud Enforcement & Recovery Act of 2009, § 4(a), Pub.L. No. 111-21, 123 Stat. 1617, 1621-22 (2009) ("FERA"), or whether they proceed under the version of the Act that prevails post-FERA.[10] Under the pre-FERA iteration of the FCA, a

---

[9]     As a concrete example of the flexible, case-specific application of the Rule 9(b) standard, the Eleventh Circuit has observed that "there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim." *Id.*

[10]    Before FERA's effective date of May 20, 2009, liability for reverse false claims under the FCA required a showing that a person knowingly made or used "a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7). By contrast, in the wake of FERA, that singular standard for reverse false claims has been disaggregated into two discrete alternatives, pursuant to which FCA liability attaches where a person *either* "knowingly makes, uses, or causes to made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, *or* knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) (Continued)

plaintiff generally must allege "(1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or caused to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government, and (5) the materiality of the misrepresentation." *Matheny*, 671 F.3d at 1224.[11] After FERA, however, reverse false claims liability attaches either (i) when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government;" or (ii) when a person "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); *see also United States ex rel. Petratos v. Genentech, Inc.*, 141 F. Supp.3d 311, 322 (D.N.J. 2015) (observing that § 3729(a)(1)(G) "creates liability for two categories"). "Both of these prongs only apply where there is an obligation to pay the Government." *Petratos*, 141 F. Supp.3d at 322.

It bears emphasis that "[i]n evaluating whether a complaint should be dismissed under Rule 12(b)(6) for failure to state a claim, a court is generally limited to reviewing what is within the four corners of the complaint." *Hayes v. U.S. Bank Nat'l Ass'n*, --- Fed.Appx. ----, 2016 WL 1593415, *3 (11th Cir. Apr. 21, 2016) (citations and internal marks omitted); *see also Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) ("[A]nalysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto.") (citation omitted). "The district court generally must convert a motion to dismiss into a motion for summary judgment if it considers materials outside the complaint." *Day v. Taylor*, 400 F.3d 1272, 1275-76 (11th Cir. 2006). Unfortunately, the parties' briefs on the Motions to Dismiss overlook this fundamental restriction, as they unhelpfully embed in their arguments numerous factual representations outside the four corners of the Amended Complaint. The undersigned deems it inappropriate at this nascent stage of the proceedings to convert the Motions to Dismiss into summary judgment motions; therefore, the parties' extrinsic factual representations in their briefs will be disregarded

---

(emphasis added). In effect, then, FERA transformed a conjunctive requirement (false record plus avoidance) into a disjunctive alternative (false record or avoidance) for reverse false claims liability.

[11]     The *Matheny* court cited the pre-FERA version of the FCA and expressly indicated that the FERA "amendments do not apply to this case." *Id.* at 1222 n.7.

for purposes of this Rule 12(b)(6) analysis, unless they fall within one of the narrow exceptions to this general rule (such as an undisputed document central to the plaintiff's claim or a matter as to which judicial notice may be taken).

## III.  Analysis of Crumb/MMW Motion.

In their joint Motion to Dismiss, defendants Dr. Crumb and MMW advance numerous arguments for dismissal of the Amended Complaint against them. The Court has sorted those contentions by category, and will address each in turn.

### A.  *Shotgun Pleading.*

For starters, Dr. Crumb and MMW assert that the Amended Complaint is a prohibited "shotgun pleading" because each count contains only boilerplate language and incorporates all preceding factual allegations. The abusive, obfuscatory practice of shotgun pleading has been roundly criticized at both the appellate and district court levels, and rightfully so. *See*, *e.g.*, *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1321 (11th Cir. 2015) (chronicling the Eleventh Circuit's "thirty-year salvo of criticism aimed at shotgun pleadings, and there is no ceasefire in sight"); *Wagner v. First Horizon Pharmaceutical Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006) ("Shotgun pleadings wreak havoc on the judicial system. … Such pleadings divert already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently.") (citations and internal marks omitted).

A complaint's incorporation by reference in each count of all preceding paragraphs may be a disfavored drafting technique; however, for better or worse, it is also an altogether commonplace convention in pleadings filed in federal court. Typically, this practice appears to stem from overanxious litigants striving to plead their claims as broadly as possible so as to avoid constraining the universe of facts on which a given claim might rely. If the mere utilization of such an unwelcome-but-pervasive pleading device mandated that a complaint be jettisoned as a shotgun pleading, then precious few civil pleadings would survive. The defining defect in shotgun pleadings is not the incorporation by reference *per se*, but is instead the net effect that it is "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. District Bd. of Trustees of Cent. Florida Community College*, 77 F.3d 364, 366 (11th Cir. 1996); *see also LaCroix v. Western Dist. of Kentucky*, 627 Fed.Appx. 816, 818 (11th Cir. Sept. 28, 2015) ("A shotgun pleading – one in which it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief –

does not comply with the standards of Rules 8(a) and 10(b).") (citations and internal quotation marks omitted).

Undoubtedly, the Amended Complaint is voluminous to the point of being unwieldy. Undoubtedly, the incorporation of all factual allegations in each count is a frowned-upon drafting practice. Upon careful review of the Amended Complaint, however, the Court does not concur with movants' assessment that it is a shotgun pleading. Specifically, Counts I and II (the FCA claims for submission of false claims and use of false records) are not confined to mere boilerplate allegations, but instead identify the specific categories of facts on which they rely.[12] While Count III (the FCA claim for concealment or avoidance of obligation to pay) trades in generalities, the Amended Complaint includes a subheading of factual allegations labeled, "CNI and Dr. Crumb/MMW knowingly concealed, avoided, or decreased an obligation to the United States." (Doc. 34, § VIII.G., ¶¶ 177-90.) Not surprisingly, the key factual allegations underpinning Count III may be readily located in that section of the pleading.

The point is straightforward: Although Dr. Crumb and MMW are correct that the Amended Complaint could have been pleaded with greater clarity and should have omitted the generic incorporation-by-reference paragraphs in each cause of action, the Government was not required to present each claim with the greatest possible specificity. *See, e.g., Brown v. Endo Pharmaceuticals, Inc.*, 38 F. Supp.3d 1312, 1323 (S.D. Ala. 2014) ("For better or worse, the Federal Rules of Civil Procedure do not permit district courts to impose upon plaintiffs the burden to plead with the greatest specificity they can.") (citation omitted). The Amended Complaint, in its present form, gives adequate notice to defendants of which facts go with which claims. As the Eleventh Circuit recently observed, "[t]he unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each

---

[12]     For example, in paragraph 287, the Amended Complaint identifies a date range for false claims allegedly presented by Dr. Crumb and MMW, recites the federal health care programs to which such false claims were allegedly submitted, and indicates the nature of the false claims. (Doc. 34, ¶ 287 ("From July 1, 2011 to present, MMW and Dr. Crumb, knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States, acting through its federal health care programs, Medicare, Alabama Medicaid and TRICARE, for Botox injections procedures and ultrasound guidance for needle placement (with and without modifier 76) on patients who did not suffer from ST and/or GTD.").)

claim rests." *Weiland*, 792 F.3d at 1323. Viewed in the context of the pleading as a whole, the aspects of the Amended Complaint to which Dr. Crumb/MMW's argument is directed (*i.e.*, use of boilerplate language and incorporation by reference of factual allegations in each count) do not deprive defendants of adequate notice of the claims against them or the grounds upon which each claim rests. For that reason, defendants' "shotgun pleading" objection is not meritorious.

## B.    *Sufficiency of Medical Necessity Allegations.*

Next, Dr. Crumb and MMW take aim at the Amended Complaint to the extent it would predicate FCA liability on a theory of false certification of medical necessity. In particular, movants lambaste the Government for failing to "cite the opinion of a single physician, much less a peer, who suggests that Dr. Crumb's treatments or use of ultrasound were medically inappropriate," and for failing "to cite any peer-review studies, treatises, or other authoritative medical literature to that effect." (Doc. 69-2, at 9.)[13]

The theme of medically unnecessary procedures crops up repeatedly in the Amended Complaint. Three examples illustrate the point. First, the Amended Complaint alleges that Dr. Crumb "manipulated patients' diagnoses to create covered claims or to increase reimbursement." (Doc. 34, at § VIII.A.3.) The allegation is that Dr. Crumb fabricated phony diagnoses of ST or GTD, then used "Botox injection procedures and multiple units of ultrasound guidance for the treatment of false diagnoses." (*Id.*, ¶ 118.) Rudimentary logic and common sense confirm that a procedure or service is medically unnecessary when the provider administers it to treat a condition that the patient does not have, based on a diagnosis that the provider knowingly falsified for the purpose of creating covered claims.[14] Second, the Amended Complaint alleges

---

[13]      In their reply brief, Dr. Crumb and MMW question whether medical necessity is even part of the Government's case anymore, as they argue that "[i]n the Amended Complaint the government tried to ditch the medical necessity theory," by recasting it as something else. (Doc. 83, at 1.) The Court cannot agree with this characterization of the pleading. As discussed *infra*, the Amended Complaint unequivocally sets forth FCA claims predicated on a theory of false certification of medical necessity.

[14]      Remarkably, Dr. Crumb and MMW maintain that "the government never actually alleges that it is pursuing these claims on a theory that Dr. Crumb intentionally lied about the diagnoses." (Doc. 69-2, at 11.) A fair reading of the Amended Complaint readily shows otherwise. In addition to the above-cited language, the Government's pleading includes pointed allegations that, for example, Dr. Crumb "knowingly misrepresented and falsified hundreds and hundreds [of] patient diagnoses of ST and GTD to create covered and payable claims for Botox (Continued)

that Dr. Crumb utilized the unreasonable, medically unnecessary procedure of ultrasound guidance in connection with routine blood draws in order to fraudulently increase reimbursements. (*Id.*, ¶¶ 131("It is well settled in the medical community that the use of ultrasound guidance with routine blood draws is not the accepted standard of medical care, not reasonable, and not medically necessary."), 134 (defendants' "sole purpose for using ultrasound guidance with routine blood draws is to fraudulently increase reimbursements to which the[y] are not entitled").) Third, the Amended Complaint alleges that defendants' "use of ultrasound guidance with Trigger Point Injections and Botox injections is not reasonable or medically necessary." (*Id.*, § VIII.C.4.) It continues on to state that using ultrasound guidance for needle placement in such circumstances "is not the established standard of care and routinely does not provide clinical value." (*Id.*, ¶ 138.)

The gravamen of Dr. Crumb / MMW's Motion to Dismiss on this issue is that the Amended Complaint flunks Rule 9(b) because the Government was obliged to identify in its pleading the identities of physicians, studies or treatises establishing that the described treatments are not medically necessary. The fundamental problem with this argument is that Dr. Crumb and MMW cite no cases interpreting Rule 9(b) to impose such a stringent pleading burden on the Government in a FCA case.[15] Defendants appear to maintain that the Government

---

injection procedures …." (Doc. 34, ¶ 260.) Elsewhere, the Amended Complaint alleges that "Dr. Crumb's decision to perform these Botox injection procedures pre-determined the patient's diagnosis of either ST or GTD" (*id.*, ¶ 110) and that "Dr. Crumb continued the fraudulent policy and practice of falsifying diagnoses to create covered and payable claims for his Botox injections procedures" (*id.*, ¶ 267). Given these and numerous other like-minded allegations in the pleading, Dr. Crumb/MMW's assertion that the Government never indicated in the Amended Complaint that its theory is that Dr. Crumb intentionally lied about the diagnoses is inaccurate.

[15]    The decision on which defendants primarily rely for this proposition, *Flanagan v. Bahal*, 2015 WL 9450826 (D.N.J. Dec. 22, 2015), is an unpublished district court case from another jurisdiction. Even so, the *Flanagan* court did not declare that a FCA plaintiff must come forward in its pleading and enumerate specific opinions from specific physicians, treatises or other sources in order to plead a medical necessity theory. Rather, *Flanagan* merely pointed out that a pleading was insufficient where the plaintiff "states that Dr. Bahal ordered multiple cardiology tests, but provides no basis as to why such tests were medically unnecessary." 2015 WL 9450826, at *5. Here, by contrast, the Government offers detailed factual allegations that defendants' practices of administering Botox injections to treat falsified diagnoses of ST and GTD, utilizing ultrasound for routine blood draws, and utilizing ultrasound guidance for needle (Continued)

-17-

must prove up its medical necessity theory in the Amended Complaint; however, binding authority specifically rejects such a draconian reading of Rule 9(b). As the Eleventh Circuit has opined, "When Rule 9(b) applies to a complaint, a plaintiff is not expected to actually *prove* his allegations, and we defer to the properly pleaded allegations of the complaint." *Clausen*, 290 F.3d at 1313. The Government has pleaded sufficient facts in support of its "false certification of medical necessity" theory to satisfy the who/what/when/where/how specifications of Rule 9(b).[16] Nothing more is needed at this stage.

### C.    *Sufficiency of False Diagnosis Allegations.*

#### 1.    *Whether False Diagnosis Claims Have Been Pleaded At All.*

As the next ground for their Motion to Dismiss, Dr. Crumb and MMW posit that it is "impossible to know what theories of FCA liability (beyond false certification of medical necessity) the government is pursuing." (Doc. 69-2, at 13.) This argument cannot be reconciled with the plain text of the Amended Complaint. Any reasonable reading of that document confirms that the touchstone of the Government's theory of liability is that defendants knowingly made false diagnoses of hundreds of patients for the purpose of obtaining reimbursements for

---

placement in trigger point injections were contrary to the established standard of care, medically unnecessary and did not provide clinical value. Even if one assumes that *Flanagan* correctly states the applicable pleading standard for medical necessity in this Circuit, the Government has satisfied it.

[16]    Nor do Dr. Crumb and MMW strengthen their position by suggesting that the "treating physician" rule strips this claim of *Twombly* plausibility because Dr. Crum is entitled to deference in his exercise of medical judgment as to the need for a particular course of treatment. (Doc. 69-2, at 12-13.) To be clear, the Amended Complaint does not allege that Dr. Crumb made mistakes or committed errors of reasonable medical judgment in administering Botox injections, utilizing ultrasound for routine blood draws, or using ultrasound guidance for trigger point injections. Rather, the Amended Complaint plainly alleges that Dr. Crumb falsified the diagnoses of ST and GTD for the sole purpose of obtaining reimbursements, and used ultrasound procedures contrary to the established standard of care in order to run up his bills to the federal government. As pleaded in the Amended Complaint, these actions were not the sort of debatable treatment plans as to which reasonable medical minds might differ; rather, they were intentional falsehoods orchestrated by Dr. Crumb for the sole purpose of fraudulently increasing reimbursements. Given this configuration of the claim, the Court finds that the Government's medical necessity theory has been nudged "across the line from conceivable to plausible" notwithstanding the pleading's failure to namecheck "a single doctor, medical publication, law, rule, or regulation" condemning Dr. Crumb's diagnoses and treatment plans. (Doc. 69-2, at 13.)

Botox injections that otherwise would not have been compensable.  Representative of the Government's extensive pleading of this basis for relief is the following language from the Amended Complaint:

> "Dr. Crumb **knowingly falsified diagnoses [of] over a thousand patients**, representing that CNI and MMW patients suffered from rare neurological disorders of [ST] and/or [GTD], **when in fact the patients did not have such diagnoses**.  **Using these false diagnoses to create a covered claim**, Dr. Crumb, CNI and MMW, **knowingly submitted, or caused to be submitted, false claims for costly Botox injection procedures** …, used in conjunction with ultrasound guidance for needle placement …, with multiple billings of CPT Code 76942 using modifier 76."

(Doc. 34, ¶ 7(a) (emphasis added).)  Such themes ripple throughout the Amended Complaint.[17]  Accordingly, any argument by defendants that the Amended Complaint is restricted to a medical necessity theory, or that defendants are unable to discern from that pleading whether the Government is pursuing a theory of falsified diagnoses, is meritless.[18]

---

[17]     *See, e.g.,* doc. 34, §§ VIII.A. (defendants "knowingly submitted false claims for Botox injections procedures and ultrasound guidance using false diagnoses … solely to create a covered and payable claim"), VIII.A.1. ("Dr. Crumb misrepresented hundreds of patients' medical condition by falsifying patient symptoms in the medical charts"), VIII.A.3. ("Dr. Crumb … manipulated patients' diagnoses to create covered claims or to increase reimbursement."); ¶¶ 260 ("Dr. Crumb … knowingly misrepresented and falsified hundreds and hundreds [of] patient diagnoses of ST and GTD to create covered and payable claims"), 267 ("After transitioning to MMW, Dr. Crumb continued the fraudulent policy and practice of falsifying diagnoses to create covered and payable claims for his Botox injections procedures.").

[18]     When faced with the Government's explanation in its brief that the essence of its FCA case is that Dr. Crumb knowingly falsified patient diagnoses and its citation to numerous supporting paragraphs of the Amended Complaint, Dr. Crumb and MMW double down on their insistence that they cannot perceive a "false diagnosis" theory in the pleading.  *See* doc. 83 at 2 ("In its opposition, the government now says it 'clearly' is pursuing an intentional misdiagnosis theory.  That, of course, is not at all clear from the Amended Complaint."), 4 (accusing the Government of "injecting new and different allegations" in its brief via a new "theory that Dr. Crumb intentionally misdiagnosed patients for the sole purpose of getting paid").  Defendants' position on this point contradicts the plain language of the pleading.  It is neither a fair nor a reasonable construction of the Amended Complaint to assert, as Dr. Crumb and MMW do repeatedly, that such pleading fails to set forth any theory of intentional misdiagnosis of patients for purposes of increasing reimbursements and receiving funds to which defendants were not entitled.

*2.      Whether the Type of False Claim Has Been Adequately Pleaded.*

Relatedly, Dr. Crumb and MMW attack the FCA claims for failing sufficiently to plead a false claim within the meaning of the statute.  Of course, the Government's claims for relief in Counts I and II require a false or fraudulent claim.  "There are two categories of false claims under the FCA: a factually false claim and a legally false claim." *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 305 (3rd Cir. 2011).  "In the paradigmatic case, a claim is [factually] false because it involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010); *see also Wilkins*, 659 F.3d at 305 ("[a] claim is factually false when the claimant misrepresents what goods or services that it provided to the Government").  Alternatively, a claim may be false pursuant to a theory of "legally false certification," pursuant to which "a claim for payment is false when it rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *Science Applications*, 626 F.3d at 1266; *see also Wilkins*, 659 F.3d at 305 ("a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment").

"False certifications can be either express or implied." *Science Applications*, 626 F.3d at 1266.  "Under the 'express false certification' theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds." *Wilkins*, 659 F.3d at 305 (citation omitted).  By contrast, liability has been found to attach on an "implied false certification" theory "when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment." *Id.* (citation omitted); *see also United States ex rel. Keeler v. Eisai, Inc.*, 568 Fed.Appx. 783, 799 (11th Cir. June 11, 2014) ("an implied certification theory … recognizes that the FCA is violated where compliance with a law, rule, or regulation is a prerequisite to payment but a claim is made when a participant has engaged in a knowing violation").

Defendants' position is that the Government has failed "to pick and clearly articulate which of the above theories of liability are being pursued ***in the complaint***." (Doc. 69-2, at 15

(emphasis in original).)[19]  On that note, Dr. Crumb and MMW balk that they cannot tell from the Amended Complaint whether the Government is "alleging that the claims are factually false, legally false, or some combination of both," and if legally false whether the theory is one of express certification (and if so, what) or implied certification.  (*Id.* at 16.)  As an initial matter, it is far from clear that Rule 9(b) compels that level of pleading detail in order for an FCA claim to withstand a motion to dismiss.  *See generally McNutt ex rel. United States v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256, 1260 (11th Cir. 2005) ("Because the government has alleged that the Burlesons submitted claims for payment knowing that the government did not owe the requested amounts, the district court properly denied the Burlesons' motion to dismiss.").  Movants' authority on this point is confined to dicta from a single district court opinion from a different jurisdiction.

At any rate, a fair reading of the Amended Complaint shows that, contrary to the arguments of Dr. Crumb / MMW, the Government has set forth in sufficient detail how the "false diagnosis" theory gives rise to FCA liability here.  For example, the Amended Complaint describes in substantial detail the so-called "Form CMS-1500" that a provider must use to submit a claim for reimbursement under Medicare.  (Doc. 34, ¶¶ 38-46.)  In that regard, the Government has pleaded facts showing that (i) the Form CMS-1500 requires that the provider list a diagnosis code for each service or procedure for which reimbursement is sought, (ii) the Form CMS-1500 also requires the provider to assign a CPT code to each such service or procedure, (iii) diagnosis-restricted procedures are not reimbursable unless an approved diagnosis code is used, (iv) health care benefit programs utilize these codes to determine whether to issue or deny payments as well as the amount of any such payments, and (v) the Form CMS-1500 includes an express certification by the provider that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me."  (*Id.*)  The Amended Complaint further alleges that claims for Alabama Medicaid reimbursement are also

---

[19]  In this same section of their brief, Dr. Crumb and MMW object that the Amended Complaint leaves unanswered questions such as the following: "[D]oes the government contend that Dr. Crumb intentionally misdiagnosed patients with ST/dystonia, understanding that the patients did not have the conditions, so that he could fraudulently bill for treating the conditions?"  (Doc. 69-2, at 15.)  As discussed *supra*, any reasonable reading of the Amended Complaint answers this question resoundingly in the affirmative.  Defendants' professed befuddlement on this point is unwarranted by the text of the pleading.

submitted via Form CMS-1500. (*Id.*, ¶ 60.) And the Complaint expressly alleges that defendants included falsified diagnoses of ST and GTD on Form CMS-1500s that they submitted to Medicare, Alabama Medicaid and TRICARE. (*Id.*, ¶¶ 256-59.)

Taken in the aggregate, then, a fair reading of these factual allegations is that Dr. Crumb knowingly falsified diagnoses of ST/GTD in hundreds of cases, then listed those falsified diagnoses on Form CMS-1500s that were submitted to federal health care programs in order to obtain reimbursement for diagnosis-restricted procedures. The Government relied on the false diagnosis codes recited on the Form CMS-1500 to pay the claims, which otherwise would have been non-payable in the absence of such diagnoses. This is the Government's "false diagnosis" theory of liability. It sounds in both factual falsity and legal falsity. And it is adequately pleaded in the Amended Complaint to comport with Rule 9(b).

### D.     *Sufficiency of Pleading Ultrasound and Modifier 25 and 76 Claims.*

As with the false diagnosis claims, Dr. Crumb and MMW profess inability to discern how the Government is accusing them of FCA violations with respect to use of ultrasound and coding modifiers 25 and 76. With respect to the ultrasound issue, these defendants indicate that they do not know whether the Government is asserting that "Dr. Crumb intentionally over-utilized the machine" or whether its theory is that "Dr. Crumb's medical judgment in using the ultrasound during the procedures at issue was … clearly unreasonable." (Doc. 69-2, at 15-16.) With respect to the coding modifiers, defendants query whether the Government's theory is that "Dr. Crumb intentionally misused those modifiers" or that his "use of those modifiers was so objectively incorrect that including them on claims he submitted for reimbursement was a reckless disregard of the claims' falsity." (*Id.*, at 16.) More generally, for both categories of claims, Dr. Crumb and MMW express concern that they cannot tell what is alleged to be false about them.

Once again, the Amended Complaint addresses defendants' challenges with sufficient specificity to discharge the Government's pleading obligations under the Federal Rules of Civil Procedure. The pleading sets forth the ultrasound guidance claims in the following terms: Even though "the use of ultrasound guidance with routine blood draws is not the accepted standard of care, not reasonable, and not medically necessary," Dr. Crumb "implemented a new ultrasound fraud scheme for routine blood draws," whereby his "sole purpose for using ultrasound guidance with routine blood draws is to fraudulently increase reimbursements." (Doc. 34, ¶¶ 126-35, 274-77.) As a separate component of the ultrasound guidance claims, the Amended Complaint

alleges that Dr. Crumb, among others, "used and billed ultrasound guidance for needle placement (CPT Code 76942) for almost all Botox and Trigger point injections that they performed," even though the use of ultrasound guidance for needle placement with such injections "is not the established standard of care and routinely does not provide clinical value." (*Id.*, ¶¶ 136, 138.) Such a practice, as alleged in the Amended Complaint, was "medically unnecessary." (*Id.*, ¶ 149.) The nature of these ultrasound guidance claims, and the manner in which the Government contends they were false, are thus sufficiently set forth in the Amended Complaint to comport with applicable pleading standards.

As for the coding modifier 76 claims, the Amended Complaint outlines the Government's theory as being that defendants "knowingly submitted claims for multiple billing of CPT Code 76942 in violation of CMS' National Correct Coding Initiative Policy." (Doc. 34, § VIII.B.) To flesh out the claim, the Amended Complaint recites a passage from the *National Correct Coding Initiative Policy Manual* reflecting that for radiologic guidance for needle placement under CPT Code 76942, only one unit of service is allowed at a single patient encounter, regardless of the number of needle placements performed. (Doc. 34, ¶ 121.) Notwithstanding that rule, the Amended Complaint continues, defendants effectively circumvented it by using the modifier 76 (denoting a procedure repeated by the same physician that was unrelated to the original procedure) to bill for as many as dozens of ultrasound guidances for a single patient encounter. (*Id.*, ¶¶ 122-25.) The Amended Complaint also alleges that defendants billed federal health programs "for multiple units of ultrasound guidance that were not rendered." (*Id.*, ¶ 269.) Thus, the Government's stated theory is that defendants' modifier 76 billings were "false as repeat procedures were not performed and CPT Code 76942 can only be billed one time per patient encounter." (*Id.*, ¶ 263.) The Amended Complaint hammers the point home as follows: "CNI, MMW and Dr. Crumb engaged in an up-coding scheme of appending modifier 76 to multiple units of ultrasound guidance for needle placement (CPT Code 76942) when repeat ultrasound procedures were not performed." (*Id.*, ¶ 7(f).) This claim is also adequately pleaded, inasmuch as defendants are reasonably notified of the manner in which the Government contends their alleged abuse of modifier 76 yielded false or fraudulent claims.

Finally, the modifier 25 claims are specified as being that defendants "engaged in an up-coding scheme of appending modifier 25 to evaluation and management CPT codes, when in fact a 'significant and separately identifiable service' was not provided." (*Id.*, ¶ 7(g).) The Amended

Complaint explains that "Modifier 25 represents a significant, separately identifiable evaluation and management (E&M) service by the same physician on the same day of the procedure or other service," for which the provider is entitled to additional reimbursement. (*Id.*, ¶ 170.) Thus, "[b]y adding modifier 25 to an E&M code on the same date of service …, the provider is seeking additional reimbursement for what he/she claims to be a significant and separately identifiable E&M service from the Botox or trigger point procedure." (*Id.*, ¶ 172.) As pleaded in the Amended Complaint, Dr. Crumb would "[t]reat the patient for the same neck and back complaints, but us[e] a different diagnosis," so as to add a modifier 25, even though "a significantly separate and identifiable service has not been performed." (*Id.*, ¶¶ 173, 175.) Also, CNI would add modifier 25 anytime there was "[a]n unscheduled procedure performed during an office visit." (*Id.*, ¶ 174.) What makes these claims fraudulent then, according to the Government's pleading, is "the use of modifier 25 to falsely create a separate and identifiable service" where none existed. (*Id.*, ¶ 260.) The manner in which defendants' alleged abuse of modifier 25 gives rise to a false or fraudulent claim for purposes of FCA liability is adequately pleaded in the Amended Complaint.[20]

---

[20] As a catch-all objection to those aspects of Counts I and II predicated on theories other than medical necessity, Dr. Crumb and MMW seek dismissal based on what they call "[t]he glaring omission of any specific citations to a requirement that is material to the decision to pay a claim and failure to explain how any claims presented to the government were non-compliant with such requirements." (Doc. 69-2, at 18.) Movants further emphasize the "materiality" point in their reply, wherein they insist that the Amended Complaint "barely even pays lip service to the materiality requirement." (Doc. 83, at 7.) The law is clear, of course, that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Universal Health Services, Inc. v. United States ex rel. Escobar*, --- U.S. ----, 136 S.Ct. 1989, 2002 (2016). "To be material, a misrepresentation must have the ability to influence the government's decision-making." *Matheny*, 671 F.3d at 1228. But the Amended Complaint identifies defendants' misrepresentations as to requirements such as the use of false listed diagnoses in the Form CMS-1500, the representation that repeat ultrasound procedures were performed when they were not, the certification that services (ultrasound guidance for routine blood draws or for nearly all Botox injections) were medically necessary when they were not, and representations that separately identifiable services had been performed when they had not. Under any reasonable reading of the Amended Complaint, such misrepresentations by defendants have been pleaded in a manner that reflects how they were both non-compliant with program requirements and material to the Government's decisions to pay the claims. This "materiality" argument is not a persuasive ground for Rule 12(b)(6) relief here, and defendants' *Escobar* arguments are unavailing, at least at the motion-to-dismiss stage.

### E. Sufficiency of Pleading Reverse False Claims.

As previously discussed, Count III of the Amended Complaint proceeds on a "reverse false claim" theory.  Under the FCA, liability for a reverse false claim may accrue where a defendant "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).

Insofar as defendants seek dismissal of the reverse false claim action because the Amended Complaint "fails to allege with particularity a specific false statement or record used to conceal, avoid, or decrease an obligation to pay money to the government" (doc. 69-2, at 21), that argument is not persuasive.  In the wake of the FERA amendments to the False Claims Act in May 2009, it is no longer imperative for a plaintiff to identify a false record or statement in order to prevail on a reverse false claim theory of liability.  *See, e.g., United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 2015 WL 1509211, *16 (M.D. Tenn. Mar. 31, 2015) (explaining that, after FERA, "there is no longer a need to show the affirmative use of a false record or statement in connection with the avoidance of an obligation to pay money to the United States").  The Government has unequivocally professed its intent to proceed under the "knowingly and improperly avoids or decreases an obligation to pay" clause of § 3729(a)(1)(G), rather than the "false record or statement" clause.  (*See* doc. 82-3, at 30-31.)  Therefore, the Amended Complaint is not deficient for failing to allege affirmative use of a false record or statement in connection with avoidance of defendants' obligation to pay the United States.[21]

---

[21]    The fact section of the Amended Complaint confirms the Government's reliance on the avoiding/decreasing clause of § 3729(a)(1)(G).  (*See* doc. 34, ¶ 178.)  That said, the Government could and should have pleaded Count III itself more clearly to delineate the prong of § 3729(a)(1)(G) under which it is traveling.  As things stand, that count of the Amended Complaint includes unhelpful and potentially misleading boilerplate language that defendants "made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States" and that "[s]uch false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false."  (Doc. 34, ¶¶ 294, 295.)  Given that the Government has now disclaimed and abandoned any intent to proceed under the "false record or statement" prong of § 3729(a)(1)(G), those portions of Paragraphs 294 and 295 of the Amended Complaint are **dismissed** in order to alleviate needless confusion as to the Government's theory of liability for its reverse false claim cause of action.

Additionally, Dr. Crumb and MMW contend that Count III is insufficiently pleaded because the Amended Complaint does not identify "a concrete obligation to pay the government at the time of any purported misrepresentations." (Doc. 69-2, at 23.) To be sure, a reverse false claim cause of action requires an "obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); *see also Matheny*, 671 F.3d at 1223 ("To sustain a reverse false claim action, relators must show that the defendants owed an obligation to pay money to the United States …"); *Petratos*, 141 F. Supp.3d at 322 (noting that reverse false claims liability requires "a 'clear' obligation or liability to the [G]overnment") (citations omitted). And the FCA defines "obligation" as meaning "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or ***from the retention of any overpayment*.**" 31 U.S.C. § 3729(b)(3) (emphasis added).

On its face, the Amended Complaint identifies sufficient facts to show that defendants had a concrete obligation to pay the Government at the time of the alleged avoidance. In particular, the Amended Complaint alleges that, at least by 2010, defendants "had actual knowledge of the improper 76942 and 76 modifier claim submissions," yet they "did not take any steps to identify and return said moneys to Cahaba and/or Alabama Medicaid within 60 days as required by the ACA." (Doc. 34, ¶ 181.)[22] The Amended Complaint further alleges that even in 2014, when they knew the Government was conducting FCA investigations into alleged false claims submitted to federal health programs relating to unnecessary Botox injections and ultrasound guidance, defendants "failed to take any corrective or repayment action." (*Id.*, ¶¶ 182-85.) These allegations sufficiently set forth an "obligation" within the meaning of § 3729(b)(3), specifically "an established duty … arising from … the retention of any

---

[22] This 60-day period referenced in the Amended Complaint relates to the requirement of the 2010 Affordable Care Act that overpayments must be returned within 60 days after they are identified. *See* 42 U.S.C. § 1320a-7k(d)(2)("An overpayment must be reported and returned by the later of -- (A) the date which is 60 days after the date on which the overpayment was identified; or (B) the date any corresponding cost report is due, if applicable.").

overpayment," so as to state a cause of action for a reverse false claim under the post-FERA version of the False Claims Act.[23]

In their reply, Dr. Crumb and MMW unveil a new argument that the reverse false claim count should be dismissed because, as pleaded in the Amended Complaint, it fails to rebut the defense that repayment "occur[red] within the 8-month time period CMS has deemed presumptively reasonable and timely." (Doc. 83, at 5.) As an initial matter, this kind of new, previously available argument in support of a motion is not appropriately presented for the first time in a reply.[24] Even if the merits of this argument were properly considered at this time (which they are not), the result would be unchanged because the Amended Complaint contains sufficient allegations of untimely repayment by defendants. The applicable regulation specifies

---

[23] Dr. Crumb and MMW appear to concede the point as to post-FERA conduct; however, they point out that "the mere retention of an overpayment could not constitute the 'obligation' to support reverse FCA liability until FERA added retention of overpayment to the definition of obligation." (Doc. 69-2, at 23.) In its response, the Government appears to distance itself from any attempt to predicate Count III on the pre-FERA version of the False Claims Act. Indeed, the Government's arguments make crystal clear that Count III hinges on the avoidance prong and the retention of overpayment aspect of the "obligation" definition, both of which are features added to the statute by FERA. What's more, the Government couches its argument exclusively in post-FERA terms, insisting that "[t]he United States clearly alleges in its AC that the Defendants violated the 2009 amended version of the reverse false claims provision" (doc. 82-3, at 30) and that "[t]he United States clearly alleged Defendants' violation of the 2009 amended version of the reverse false claims provision" (*id.* at 31). Nowhere does the Government seek to bolster a pre-FERA reverse false claims action against defendants or respond to defendants' arguments that one has not been adequately pleaded. Nonetheless, the Amended Complaint purports on its face to be proceeding under both the pre-2009 and post-2009 version of the statute. *See* doc. 34, ¶ 179 ("Failure to return to the federal government any overpayment… constitutes a reverse false claim actionable under … § 3729(a)(7) of the prior version of the FCA."), ¶¶ 293-96 (identifying both the 2006 and 2013 versions of the FCA as applying to Count III). Because defendants have pointed out pleading deficiencies as to the portion of Count III alleging violations of the pre-FERA reverse false claims provision and because the Government has apparently disavowed same by advocating exclusively for the post-FERA part of the claim, the pre-FERA aspects of Count III will be **dismissed**.

[24] *See, e.g., Herring v. Secretary, Dep't of Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotes omitted*); Brown v. CitiMortgage, Inc.*, 817 F. Supp.2d 1328, 1332 (S.D. Ala. 2011) (explaining that "it is improper for a litigant to present new arguments in a reply brief" and that "[n]ew arguments presented in reply briefs are generally not considered by federal courts").

that "[a] person has identified an overpayment when the person has, or **should have through the exercise of reasonable diligence**, determined that the person has received an overpayment and quantified the amount of the overpayment." 42 C.F.R. § 401.305(a)(2) (emphasis added). The Amended Complaint alleges that defendants had actual knowledge of the improper claim submissions and attendant overpayments by no later than 2010, yet failed to conduct any investigation or to make any repayment at all (and, even then, nothing more than a "partial repayment") until June 2015. (Doc. 34, ¶¶ 180-89.) Given these allegations, the Court cannot agree with Dr. Crumb/MMW's position that the Amended Complaint should be dismissed because it does not establish that defendants failed to repay the Government for retained overpayments within a "presumptively reasonable" eight-month window.[25]

### F.     *Whether Common-Law Claims Are Properly Dismissed as Derivative.*

As the final ground for their Motion to Dismiss, Dr. Crumb and MMW take aim at Count IV (payment under mistake) and Count V (unjust enrichment). Movants' position is that these two federal common-law claims "should be dismissed because they are purely derivative of the deficient FCA claims." (Doc. 69-2, at 24.) As a legal matter, however, that statement is incorrect. These common-law claims are independent of, alternative to, and have distinct elements of proof from, the Government's claims under the False Claims Act.[26] Indeed, these

---

[25]      Defendants' only cited support for the eight-month grace period championed in their brief is a comment from the Centers for Medicare & Medicaid Services published in the *Federal Register* on February 12, 2016. *See* 81 Fed.Reg. 7654-01, at 7662. Defendants identify no legal basis for suggesting that this Court is bound by the agency's comment, much less that the comment properly applies to alleged overpayments that occurred several years before such comment was made. The accompanying regulation makes no reference to an eight-month presumption of timeliness. *See* 42 C.F.R. § 401.305 (effective 3/14/2016).

[26]      In arguing otherwise, the lone authority on which Dr. Crumb and MMW rely is an unpublished district court case in which the court, without elaboration or explanation, made a conclusory determination that the plaintiff's claims for unjust enrichment and payment by mistake should be dismissed because they "are purely derivative of the FCA claims," which the court had already dismissed. *United States v. Aegis Therapies, Inc.*, 2015 WL 1541491, *14 (S.D. Ga. Mar. 31, 2015). Nothing in *Aegis Therapies* can be read as barring the Government from pursuing common-law claims on theories such as unjust enrichment and payment by mistake, side by side with FCA causes of action. Indeed, *Aegis Therapies* cannot reasonably be read as mandating dismissal of unjust enrichment and payment by mistake claims whenever FCA claims are also pleaded, which is essentially defendants' argument here.

same defendants devoted dozens of pages of briefing to arguing and applying specific statutory requirements for the FCA causes of action. Those FCA-specific requirements identified in Dr. Crumb/MMW's briefing do not extend to Counts IV and V; rather, FCA claims "require knowing or reckless material misrepresentations …, in contrast to the lower scienter thresholds for mistake of fact and unjust enrichment." *United States v. Bellecci*, 2008 WL 802367, *3 (E.D. Cal. Mar. 26, 2008). Stated differently, it is readily possible to envision scenarios where the Government's claims for payment under mistake of fact and unjust enrichment may remain in play even if the FCA claims fail. Moreover, defendants have identified no authority, and the Court is aware of none, deeming the FCA to be the Government's sole and exclusive remedy for circumstances in which it claims to have been tricked into paying funds through federal health care programs that the recipients were not entitled to receive. Of course, the Government, like all plaintiffs in federal court, may plead its case in the alternative. *See* Rule 8(d)(2), Fed.R.Civ.P. ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.").

Review of applicable authorities confirms that it is commonplace for the Government to plead common-law theories of payment by mistake and unjust enrichment contemporaneously with FCA claims. Moreover, federal courts have routinely allowed common-law claims and FCA claims to coexist. *See, e.g., United States ex rel. Heesch v. Diagnostic Physicians Group, P.C.*, 2014 WL 2154241, *11 (S.D. Ala. May 22, 2014) ("even where the Government cannot establish that a defendant acted knowingly for purposes of the False Claims Act, the Government may be entitled to recovery under the alternative theory of payment by mistake of fact.").[27] This

---

[27] *See also United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 605 (8th Cir. 1999) (affirming judgment in case in which FCA claims and unjust enrichment claims both went to trial, with the trial court entering a large award for the Government on unjust enrichment claim after jury denied relief on FCA cause of action); *United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp.3d 67, 80 (D.D.C. 2015) (denying motion to dismiss payment by mistake and unjust enrichment claims, because "courts in this district and elsewhere have permitted the government to proceed with claims alleging FCA violations as well as claims for unjust enrichment or payment by mistake") (citation omitted); *United States v. Education Management Corp.*, 871 F. Supp.2d 433, 459 (W.D. Pa. 2012) (declining to dismiss common-law claims for unjust enrichment and mistake of fact because "the False Claims Act does not preempt federal common law remedies"); *United States v. Stevens*, 605 F. Supp.2d 863, 870 (W.D. Ky. 2008) ("At this stage of the litigation, since the FCA claim against Ms. Bailey has not been fully litigated, it would be premature to dismiss the alternative unjust enrichment claim."); *United* (Continued)

Court will do the same. The Motion to Dismiss by Dr. Crumb / MMW is meritless insofar as it seeks dismissal of Counts IV and V as "purely derivative" of the FCA causes of action.

## IV. Analysis of CNI Motion.

In its Motion to Dismiss, defendant Coastal Neurological Institute, P.C., raises numerous challenges to the sufficiency of the Amended Complaint. Despite repeated admonitions to minimize overlap, there is considerable redundancy between the arguments presented in CNI's Motion and those set forth in Dr.Crumb/MMW's Motion. It would serve no constructive purpose for the Court to reiterate its analysis of duplicative grounds for dismissal set forth in both Motions to Dismiss; however, CNI's Motion will be addressed herein insofar as it raises arguments distinct from those submitted by Dr. Crumb and MMW.

### A. Sufficiency and Accuracy of Details of Investigation.

As its first line of attack, CNI maintains that the Amended Complaint runs afoul of Rule 9(b) because it lacks specificity as to the Government's investigation and the specifics of the alleged wrongdoing. (Doc. 52, at 8.) In that regard, for example, CNI objects to the pleading's

---

*States ex rel. Purcell v. MWI Corp.*, 254 F. Supp.2d 69, 79 (D.D.C. 2003) ("at the motion-to-dismiss stage, courts in this district and elsewhere have permitted the government to proceed with claims alleging FCA violations as well as claims for unjust enrichment or payment by mistake"); *United States v. Medica-Rents Co.*, 285 F. Supp.2d 742, 776 (N.D. Tex. 2003) ("Since the Court has held that the defendants are entitled to summary judgment on the plaintiffs' claims under the FCA, the plaintiffs may now proceed on alternate theories of liability such as payment by mistake or unjust enrichment.") ; *United States ex rel. Roby v. Boeing Co.*, 184 F.R.D. 107, 112-13 (S.D. Ohio 1998) (concurring with Government's assertion that "it may plead, in the alternative, common law claims for fraud, payment by mistake, unjust enrichment, and breach of contract along with its claim under the FCA"); *United States v. Bae Systems Tactical Vehicle Systems, LP*, 2016 WL 894567, *5 (E.D. Mich. Mar. 9, 2016) ("As numerous courts within this district have held, a plaintiff may allege alternative theories of FCA violations and quasi-contractual claims .... The Court finds it would be premature to dismiss such claims at this stage of the litigation."); *United States v. Fadul*, 2013 WL 781614, *12 (D. Md. Feb. 28, 2013) (observing that a claim for payment by mistake of fact is "available to the United States and is independent of statute," and that "even where it cannot establish that a defendant acted knowingly for purposes of the False Claims Act, the Government may be entitled to recovery under the alternative theory of payment by mistake of fact") (citations omitted); *United States ex rel. Costa v. Baker & Taylor, Inc.*, 1998 WL 230979, *14 (N.D. Cal. Mar. 20, 1998) (denying motion to dismiss common law claims even though "[t]here is no question that plaintiffs' common law claims are bound up in their claims under the False Claims Acts," because "the common law claims serve as alternate theories of recovery").

allegations that "ZPIC medical professionals conducted a medical record review of 20 patient files" and "concluded that the chart documentation was insufficient." (Doc. 34, ¶ 142.) CNI's insistence that the Amended Complaint fails to specify what documentation was insufficient or how it was lacking is counterfactual.[28] CNI also protests that the Amended Complaint fails to identify the "USAO medical professionals" who reviewed additional charts, or to name the patients whose charts were reviewed. However, the mere fact that the Amended Complaint fails to list these individuals by name does not discredit the Rule 9(b) value of the investigative details that are pleaded, much less render the Amended Complaint fatally deficient as generalized and conclusory. More to the point, movant does not cite any authorities that would construe Rule 9(b) to impose such a stringent requirement at the pleading stage, and the Eleventh Circuit has suggested otherwise. *See, e.g., Clausen*, 290 F.3d at 1312 n.21 (explaining that reciting "some of the types of information that might have helped [plaintiff] state an essential element of his claim with particularity … does not mandate all of this information for any of the alleged claims," and that "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)").[29]

Similar problems abound with CNI's other, related arguments along these lines. (Doc. 52, at 9-11.) CNI balks that the Amended Complaint fails to identify which patients were interviewed in the Government's investigation (doc. 34, ¶ 108), but again points to no legal requirement mandating dismissal of the Amended Complaint unless those patients' names are pleaded. CNI quibbles with the Amended Complaint's allegations that the patients interviewed

---

[28] Contrary to CNI's position, paragraphs 143 through 146 of the Amended Complaint delineate the documentation found to be inadequate by the ZPIC medical professionals, and paragraphs 137 through 141 and 147 through 148 describe the purported inadequacies.

[29] Equally unavailing is CNI's apparent contention that the Amended Complaint must be dismissed because the Government, in addition to reciting specific examples of the alleged deficiencies in documentation, has not "shown [them] to be representative of all the claims the United States contends are false." (Doc. 52, at 9.) As previously noted, the Government is under no obligation to prove its claims at the pleadings stage. Nor will the Court deem the Amended Complaint violative of Rule 9(b) because it omits the word "representative" before "example," where a reasonable reading of those examples in the context of the Amended Complaint reflects that the Government is indeed framing them as representative of the deficiencies as a whole.

by the Government failed to exhibit symptoms of ST or GTD (*id.*, ¶ 109); however, in so doing, defendant ignores other well-pleaded allegations bolstering the "false diagnosis" claims, the fact that the procedural posture of this action is a Rule 12(b) motion (not a summary judgment motion), and the legal requirement that reasonable inferences in the pleadings be drawn in the Government's favor, not the defendant's. CNI further criticizes the Amended Complaint for referencing a "a policy of adding modifier 25 to any office visit wherein a[n unscheduled procedure was performed]." (*Id.*, ¶ 174.) Specifically, CNI complains that a copy of the policy is not attached to the pleading and that the Amended Complaint fails to allege "who at CNI put this policy into effect, or when it was implemented." (Doc. 52, at 10.) Of course, the Amended Complaint does not characterize this "policy" as being a formal written document, and CNI does not point to anything in Rule 9(b) that would require the plaintiff to enumerate the entire organizational history (including its architects, genesis, derivation, evolution and implementation) of any such policy in the pleading in order to pass muster under baseline pleading rules.

In this same series of arguments, CNI sees fit to attack the Amended Complaint for containing factual allegations that, according to CNI, "have no basis in fact" and that the Government "knows are inaccurate." (Doc. 52, at 10-11.) Such inflammatory argument – accusing the Government of knowingly misrepresenting the facts in its pleading – is manifestly inappropriate at the Rule 12(b)(6) stage and does not constitute a cognizable basis for dismissal of the Amended Complaint. As defendant knows, well-pleaded facts in a pleading are accepted as true at this stage, no matter how vehemently a defendant may dispute their veracity. *See, e.g., Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012) (on Rule 12(b)(6) review, "[w]e state the facts as alleged in the Complaint, accept them as true, and construe them in the light most favorable to Plaintiffs").[30] The time to bicker about the accuracy of well-pleaded facts and the plaintiff's motives in alleging them is not now.

CNI also contends that the Amended Complaint is subject to dismissal because it fails to specify whether the extensive Medicare and Medicaid claims data attached to the pleading

---

[30]     *See also Speaker v. U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010) ("In ruling on a 12(b)(6) motion, the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff.").

"constitute[s] all of the allegedly false claims to Medicare and Medicaid." (Doc. 52, at 13.) In that same general category of argument, CNI seeks dismissal of the Amended Complaint because it "fails to identify the allegedly false claims submitted to TRICARE," or to quantify the unreimbursed sums that form the basis of the reverse false claim action at Count III. (*Id.* at 13-14.) Once again, movant's argument is untethered to Rule 9(b) or the authorities construing it. The Eleventh Circuit has instructed that "while dates, amounts, and account numbers can provide particularity, Rule 9(b) does not mandate all of that information for each alleged claim, only some of the information for at least some of the claims." *Matheny*, 671 F.3d at 1227 (citations and internal quotation marks omitted). The Amended Complaint unquestionably does that. Exhibits B through D to that pleading are nearly 300 pages of Medicare and Alabama Medicaid claims printouts, identifying patient names, providers, dates of service, diagnoses, CPT codes, modifiers, amounts billed and paid, claim numbers, and more. These exhibits thus provide extensive, particularized, raw data underlying the false diagnosis claims, false ultrasound guidance claims, ultrasound/routine blood draw claims, and 25/76 modifier claims.[31] (*See* doc. 34, ¶¶ 261, 270, 275; doc. 37.) Additionally, the Amended Complaint sets forth specific detailed examples of TRICARE claims data for certain claims. (Doc. 34, ¶¶ 266, 276-77.) And the Amended Complaint includes sufficiently detailed factual allegations about the retained overpayments to satisfy pleading requirements. (*Id.*, ¶¶ 187-90.) In particular, the Amended Complaint identifies overpayments (and itemizes 76 modifier claims in the exhibits). CNI surely knows, or can ascertain, which of those payments it has and has not returned to the Government, and when.

As another ground for dismissal, CNI laments the Amended Complaint's inclusion of alternative theories of liability, reasoning "that should not be the case in an Amended Complaint filed by the United States after a fifteen month investigation." (Doc. 52, at 17.) Of course, the Federal Rules of Civil Procedure expressly allow pleading in the alternative, and make no distinction in pleading standards between complaints filed by the Government after extensive investigation and those filed by private actors after a lesser quantum of prior inquiry. *See, e.g.,* Rule 8(d)(3), Fed.R.Civ.P. ("A party may state as many separate claims or defenses as it has,

---

[31]     These exhibits were, of course, filed under seal to protect the confidentiality of the Personally Identifiable Information and Confidential Health Information contained therein.

regardless of consistency."); *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1273 (11th Cir. 2009) ("First, we are not troubled by what the district court saw as inconsistent allegations. Rule 8(d) of the Federal Rules of Civil Procedure expressly permits the pleading of both alternative and inconsistent claims."). This is not a viable objection.

### B.    *Adequacy of Generalized References to CNI.*

For its next category of objections, CNI criticizes the Amended Complaint for making "extensive and generalized allegations referencing only 'CNI,'" without naming the specific representatives of CNI who were involved. (Doc. 52, at 11.) It is true that Rule 9(b) has been interpreted as requiring pleadings to identify the agents or corporate representatives of an entity who participated in the alleged fraud.[32]

It is also true, however, that the Amended Complaint identifies (by name and/or position) various CNI agents or employees who are alleged to have participated in the FCA violations. In that regard, the Amended Complaint includes the following facts: (i) the identities of CNI's physician shareholders, employee physicians (with dates of employment) and Chief Administrative Officer during the relevant timeframe (doc. 34, ¶¶ 15-16, 71, 73-76); (ii) statements that the CNI billing department submitted all claims for payment to Medicare, Alabama Medicaid and TRICARE, and completed the CMS-1500 Forms (*id.*, ¶ 76); (iii) statements that CNI physician shareholders and physician employees completed charts, ordered tests, performed procedures, made diagnoses and devised treatment plans (*id.*, ¶ 77); and (iv) statements that CNI billing representatives report to billing managers, who in turn report to the Chief Administrative Officer and ultimately the shareholders (*id.*, ¶ 78). The Amended Complaint attributes many acts and omissions material to the fraud to specific CNI agents, including numerous references to Dr. Crumb and others in their capacity as physician employees, references to billing directives by the Chief Administrative Officer, and passages identifying participants by their corporate role (*i.e.*, "CNI billing personnel").

---

[32]    *See, e.g., American United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1070 (11th Cir. 2007) (affirming dismissal of fraud claims for lack of Rule 9(b) specificity where complaint "did not allege which of the receivership entities' agents or corporate representatives engaged in this fraud"); *Wallace v. SunTrust Mortg., Inc.*, 974 F. Supp.2d 1358, 1367 (S.D. Ala. 2013) (dismissing fraud claim under Rule 9(b) where plaintiff "does not specifically outline the individuals or agents of SunTrust who intentionally mislead her").

To be sure, defendant is correct that, on certain occasions, the Amended Complaint references CNI generally, without identifying a particular actor, speaker, or decisionmaker. But CNI cites no authority standing for the proposition that Rule 9(b) requires a plaintiff to identify with specificity each corporate agent who engaged in each act or omission giving rise to the fraud claims in the complaint.[33] "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged.'" *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (citation omitted). Under any reasonable reading, the Amended Complaint specifically alerts CNI to the precise misconduct with which it is charged. That it does not always identify a particular corporate agent who made a certain statement or decision is not fatal under Rule 9(b), where the Amended Complaint gives specific, detailed notice to this defendant of what wrongdoing it is alleged to have engaged in, and which of its agents or representatives were purportedly involved.[34]

### C.     *Alleged Failure to Plead Certifications by CNI.*

As its next ground for Rule 12(b)(6) relief, CNI contends that the Amended Complaint must be dismissed because it "has not identified a single specific certification (much less [a] false one) made by CNI." (Doc. 52, at 18.)

This argument cannot be reconciled with the plain language of the pleading. As previously discussed herein, the Amended Complaint documents in detail the central role of the Form CMS-1500 in the reimbursement process under both Medicare and Alabama Medicaid. (Doc. 34, ¶¶ 38-46, 60.) It specifies the contents of that Form CMS-1500, including the diagnosis codes, the CPT codes and modifiers that classify the services performed, and the

---

[33]     Instead, defendant relies on cases such as *United States ex rel. Carroll v. JFK Medical Center*, 2002 WL 31941007, *5-6 (S.D. Fla. Nov. 15, 2002), which are readily distinguishable because they involved pleadings that were far more vague and "insufficient to allow Defendants … to determine who was involved in the alleged fraud." *Id.* at *6. By contrast, the Amended Complaint in this case – taken as a whole – is more than adequate to allow CNI to determine who was involved in the alleged fraud.

[34]     As part of its argument, CNI posits that "[s]urely if the United States can quote specific statements it believes were made, it knows the person who made the statement." (Doc. 52, at 12.) This assumption may be correct, but it is also irrelevant. The Court is aware of no pleading requirement – under Rule 9(b) or otherwise – requiring a plaintiff to include in its complaint everything it knows in order to withstand scrutiny for compliance with fundamental pleading requirements.

express certification that "the services on this form were medically indicated and necessary for the health of the patient and were personally furnished by me." (*Id.*, ¶¶ 39-44.) It indicates that Medicare providers are required to submit an electronic Form CMS-1500 for payment. (*Id.*, ¶ 38.) And it reflects that CNI "submits all claims to Medicare electronically" and was "enrolled in the Alabama Medicaid Program and authorized to bill Alabama Medicaid." (*Id.*, ¶¶ 45, 53.) The Amended Complaint also identifies hundreds of claims submitted by CNI to Medicare and Alabama Medicaid. (*Id.* at Exhs. B-D.) The point is simple: Each one of those claims submitted by CNI would have been submitted on a Form CMS-1500, and therefore would have contained the express certifications embodied within that form. Given these factual allegations, CNI's contention that the Amended Complaint "does not identify a single specific certification made by CNI" (doc. 52, at 18) is counterfactual.[35]

CNI's three subsidiary objections on this issue do not strengthen its Motion to Dismiss. First, CNI protests that the Amended Complaint says nothing about "alleged certifications to Alabama Medicaid and TRICARE." (Doc. 52, at 20.) But the Amended Complaint expressly links CNI claim submissions under both Alabama Medicaid and TRICARE to the Form CMS-1500, such that they would be covered by the same express certifications in the Form CMS-1500 as the Medicare claims are.[36] Second, CNI suggests that there may have been no certifications

---

[35] Furthermore, the Amended Complaint identifies other pertinent certifications made by CNI personnel. For example, the Government's pleading indicates that all CNI physicians participating in the Medicare program executed Form CMS-855I, which contained a certification that the signing physician "agree[s] to abide by the Medicare laws, regulations and program instructions," and that he or she "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare." (Doc. 34, ¶¶ 24, 26.) The Amended Complaint further alleges that CNI physician shareholders Troy H. Middleton and W. Brent Faircloth executed Form CMS-855B on behalf of CNI, making the same certifications as the CNI physician participants did. (*Id.*, ¶¶ 29-31.) Likewise, with respect to Alabama Medicaid, the Amended Complaint sets forth specific allegations that CNI physician shareholders and physician employees executed Alabama Medicaid Provider Agreements including certifications that they will abide by program rules and regulations, that claims for payment would be submitted in accordance with Alabama Medicaid guidelines, and that "information submitted regarding claims or encounter data will be true, accurate, [and] complete." (*Id.*, ¶¶ 54-57.) Similar certifications are alleged as to TRICARE claims. (*Id.*, ¶¶ 67-70.)

[36] *See* doc. 34, ¶¶ 60 ("Like Medicare claims, claims for Medicaid reimbursement are also submitted via paper or electronic versions of the Form CMS-1500."), 76 ("The CNI billing department was, and continues to be, responsible for completing Form CMS-1500 for (Continued)

associated with Form CMS-1500s because it submitted Medicare claims electronically, rather than in paper form. (Doc 52, at 20.) This contention does not make sense. After all, the Amended Complaint specifically alleges that Form CMS-1500 is used to submit claims, but that the document is submitted electronically rather than on paper. From the text of the pleading, there is no reason to believe that the certifications contained in a Form CMS-1500 would be any different when it is submitted electronically than when it is submitted in paper form; rather, all reasonable inferences from the well-pleaded factual allegations are to the contrary. Whatever certifications are stated on that form would presumably be present regardless of the method of submission.[37] CNI acknowledges that the Amended Complaint alleges that the same certifications are made on Form CMS-1500 when it is submitted electronically versus physically. (Doc. 52, at 20.) That factual allegation suffices for purposes of the motion-to-dismiss stage.

Third, CNI argues that any certifications identified in the Amended Complaint fall short because they fail to "state **who** at CNI made these alleged false certifications or when they were made." (Doc. 52, at 21.) In that regard, CNI points to paragraph 44 of the Complaint, which alleges what "a provider" certifies when filing a Form CMS-1500 electronically. To the extent CNI is suggesting it cannot discern who the provider was who made each certification, that assertion is undermined by the detailed Medicare and Alabama Medicaid claims data appended to the Amended Complaint, which includes a column bearing the header "Prov Name," reciting for each purportedly false or fraudulent claim the identity of the CNI provider involved. (Doc. 37, Exhs. B-D.) Likewise, CNI's insistence that the Amended Complaint is devoid of any indication when the false certifications were made is belied by those same exhibits, which include a column labeled "Date Clm Re" for each purportedly false claim showing the date the claim was received. (*Id.*) This claim-specific data satisfies Rule 9(b) and gives CNI "fair notice" of the details of the misconduct in which it is accused of engaging.

---

submission to Medicare, Alabama Medicaid, TRICARE, and other third party payers …"), 257 ("CNI electronically submitted false claims to Medicare, Alabama Medicaid, and TRICARE, on behalf of its physician employees, on Form CMS-1500s").

[37]   Any lingering doubts on that question for purposes of CNI's Motion to Dismiss are eradicated by the Amended Complaint's unequivocal identification of the certification made by a provider "[w]hen filing the electronic equivalent of Form CMS-1500." (Doc. 34, ¶ 44.)

## D. *Implied Certifications.*

CNI also takes issue with the Amended Complaint insofar as the Government is proceeding on a theory of implied certifications, rather than express certifications. (Doc. 52, at 21-23.) The leading case explaining this theory of FCA liability is *Universal Health Services, Inc. v. United States ex rel. Escobar*, --- U.S. ----, 136 S.Ct. 1989 (2016), which the Supreme Court decided near the conclusion of its most recent term. The *Escobar* Court unanimously held "that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." 136 S.Ct. at 2001.[38]

Review of the Amended Complaint readily confirms that the Government's implied certification allegations satisfy both prongs of the *Escobar* standard. As to the first requirement, the Amended Complaint clearly alleges that the Form CMS-1500 claims that CNI submitted were much more than bare requests for payment, but also made specific representations about the services provided and the reasons for those services (*i.e.*, diagnoses). As to the second element, the Amended Complaint alleges that CNI failed to disclose such matters as (i) that the listed diagnoses did not conform to the *International Classification of Diseases* system because they had been falsified to create covered claims, (ii) that the Botox and ultrasound guidance procedures performed were not actually provided for covered and eligible diagnoses, and (iii) that the 76 modifiers and 25 modifiers used in the Form CMS-1500 claims did not comport with

---

[38]      *Escobar* was decided while briefing on the Motions to Dismiss was underway. One effect of *Escobar* was to decimate CNI's assertion in its principal brief that implied certification claims necessarily fail where the pleading "does not identify any alleged false certifications that were a condition of payment." (Doc. 52, at 21.) On that point, *Escobar* rejected as unsupported by the statute a provider's argument that "a defendant should face False Claims Act liability only if it fails to disclose the violation of a contractual, statutory, or regulatory provision that the Government expressly designated a condition of payment." 136 S.Ct. at 2001; *see also id.* at 1996 ("False Claims Act liability for failing to disclose violations of legal requirements does not turn upon whether those requirements were expressly designated as conditions of payment"). Of course, CNI is not to blame for failing to anticipate the rule announced in *Escobar* subsequent to its submission of a principal brief; however, the result is that movant's "condition of payment" argument is now ineffectual as a matter of law.

CMS policy and program requirements. Because of those nondisclosures, the representations in the claim forms (*e.g.*, that the Botox injections were medically necessary, that the patients had covered diagnoses, that the 76 modifier applied to particular patient encounters, that CNI physicians had provided significant and separate E&M services on the same day as another procedure) were, at best, misleading half-truths.

Nor can *Escobar*'s discussion of the "materiality" requirement avail CNI at the Rule 12(b)(6) stage. In *Escobar*, the Court recognized that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." 136 S.Ct. at 2002. "To be material, a misrepresentation must have the ability to influence the government's decision-making." *Matheny*, 671 F.3d at 1228. "[W]hen evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include … evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Escobar*, 136 S.Ct. at 2003. By contrast, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.*

Taken as a whole, the allegations of the Amended Complaint raise a compelling inference that the purported misrepresentations in question were material to the Government's payment decision. For example, the Amended Complaint reflects that the Botox injection services would not have been reimbursable unless they were provided for a covered diagnosis. CNI's alleged undisclosed noncompliance with applicable requirements for diagnosing a patient is thus adequately pleaded to be "material" to the Government's payment decision because "claims billed for the treatment of [these] false diagnoses are not covered and payable claims" under applicable rules, regulations, policies and contract terms. (Doc. 34, ¶ 262.) Under the circumstances, given the specific form and nature of the alleged misrepresentations at issue, the Court concludes that the Government has adequately pleaded materiality under *Escobar*.

### E.    *Factually False Claims.*

CNI also objects that "the Amended Complaint contains absolutely no specific allegations of any factually false claims." (Doc. 52, at 23.) CNI goes on to protest that any such

"factually false claims" for services not rendered or medication not administered are not identified in the pleading, "much less the date of such claims, who allegedly submitted them, or the beneficiary who allegedly did not receive the services." (*Id.* at 24.)

A reasonable reading of the Amended Complaint reflects that multiple categories of factually false claims have been pleaded. For example, the "worthless services" claims[39] involving use of ultrasound guidance for routine blood draws or for needle placement in almost all Botox and Trigger point injections are specifically pleaded (with examples) in the Amended Complaint. Such claims constitute a species of factually false claims because they effectively amount to claims for services not actually provided. *See, e.g., United States ex rel. Mikes v. Straus*, 274 F.3d 687, 703 (2nd Cir. 2001) ("We agree that a worthless services claim is a distinct claim under the Act. It is effectively derivative of an allegation that a claim is factually false because it seeks reimbursement for a service not provided.").[40] As another example, the

_____

[39]    CNI objects that the Government has injected a brand-new "worthless services" theory of liability in this case via its response brief when it was not there before. (Doc. 84, at 2-3.) Although defendant may be correct that the word "worthless" does not appear in the Amended Complaint, it is incorrect to characterize it as "new theory of falsity" not found in the pleading. (*Id.* at 2.) On the contrary, a reasonable reading of the Amended Complaint reveals clear, specific allegations invoking a worthless services theory of liability. *See, e.g.,* doc. 34, at ¶¶ 7d-e (referencing services "that are not reasonable, not medically necessary, and not supported by the medical charts"), 131 (describing procedures that are "not the accepted standard of care, not reasonable, and not medically necessary"), 134 (describing procedures performed for the "sole purpose" of fraudulently increasing reimbursements), 138 (describing services that are "not the established standard of care and routinely [do] not provide clinical value"). A service that is described in terms such as "does not provide clinical value" is worthless, irrespective of whether the term "worthless" appears in the pleading; thus, the worthless services concept is embedded in the allegations of the Amended Complaint.

[40]    *See also Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011) ("A test known to be of 'no medical value,' that is billed to the government would constitute a claim for 'worthless services,' because the test is so deficient that for all practical purposes it is the equivalent of no performance at all. … If VPA sought reimbursement for services that it knew were not just of poor quality but had *no* medical value, then it would have effectively submitted claims for services that were not actually provided. This would amount to a 'false or fraudulent' claim within the meaning of the FCA.") (citations and internal quotation marks omitted); *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001) ("In an appropriate case, knowingly billing for worthless services or recklessly doing so with deliberate ignorance may be actionable under § 3729, regardless of any false certification conduct."); *United States ex rel. Campie v. Gilead Sciences, Inc.*, 2015 WL 3659765, *8 (N.D. Cal. June 12, (Continued)

Amended Complaint recites a circumstance in which CNI and Dr. Crumb used the 76 modifier (denoting repeated services unrelated and subsequent to the original service) to bill Medicare for 32 "echo guide for biopsy" procedures on a single date in a single patient encounter.  (Doc. 34, ¶ 123.)  The clear implication of the Amended Complaint is that those 32 separate and subsequent procedures were not actually performed, rendering the claim factually false.  Additionally, the 25 modifier claims (which are identified in detail in exhibits to the Amended Complaint) are alleged to be factually false because they amount to abuse of the modifier to bill Medicare "when a significantly separate and identifiable service has not been performed by a physician."  (*Id.*, ¶ 175.)[41]  On the strength of these and other allegations in the Amended Complaint, the Court cannot agree with CNI's hyperbole in its Rule 12(b)(6) filings that "the Amended Complaint has not identified a single factually false claim."  (Doc. 52, at 23.)

### F.     *Medical Necessity and False Diagnosis.*[42]

---

2015) (recognizing viability of "a factually false certification claim based on worthless services").

[41]     Elsewhere in the Amended Complaint, the Government pointedly identifies a patient, DD, whose chart "reflects the false documentation of a procedure that was billed and not performed, e.g. Botox injections to the cervical region."  (Doc. 34, ¶ 105.)  This would also be a factually false claim for FCA purposes.

[42]     In its reply, CNI endeavors to impugn the Government's "false diagnosis" theory of liability, calling it a "remarkable change in the foundational theory of liability" that the Government "first advanced in the Amended Complaint, and only after the United States reviewed defendants' initial motions to dismiss."  (Doc. 84, at 6.)  The Court rejects any implication that the filing of the Amended Complaint (doc. 34) was somehow improper because it came after the Government had a "free look" at defendants' motions to dismiss.  The Federal Rules of Civil Procedure afforded the Government an unqualified right to file an amended pleading at that time.  A defendant filing a pre-answer motion to dismiss runs the risk that the plaintiff may – as a matter of right – make substantial modifications to its pleading to correct any actual or perceived defect identified by a Rule 12(b)(6) motion.  No inference of unfairness, bad faith or lack of merit may be drawn from the mere fact that a plaintiff availed itself of that right.  The "false diagnosis" theory is part of the case now.  How and when it came to be is of no consequence for Rule 12(b)(6) purposes.  Even if it were, the circumstances presented here do not suggest that the false diagnosis theory is defective because of the timing of the Government's reliance on it.

As an additional ground for seeking dismissal of the Amended Complaint, CNI asserts that the Amended Complaint's use of the term "false diagnosis" is nothing more than a way of "artfully pleading" medical necessity, and that the Government has failed to plead sufficient facts to support any such theory of liability. (Doc. 52, at 24-25.)[43]

As an initial matter, it is not correct to assert, as CNI appears to do, that the only medical necessity claims presented in the Amended Complaint hinge on a theory of false diagnosis. (Doc. 52, at 24-29.) To the contrary, and as discussed in considerable detail *supra*, the Amended Complaint raises various other FCA claims against CNI that do not depend on the truth or falsity of the diagnosis. Indeed, the Amended Complaint identifies instances of medically unnecessary services performed "regardless of patient diagnosis" (*see e.g.,* doc. 34, ¶ 120; § VIII.C.4), particularly in the areas of 76 modifiers, 25 modifiers, ultrasound guidance with routine blood draws, and ultrasound guidance for almost all Botox and Trigger point injections. In other words, certain categories of claims for medically unnecessary services identified in the Amended Complaint would remain intact and in play even if every patient had been correctly and accurately diagnosed. Thus, the false diagnosis claims are a subset – not the complete universe – of the Government's medical necessity claims.

On the subject of false diagnoses, however, CNI's position is that the Amended Complaint is devoid of specific allegations "to prove that the beneficiaries who were diagnosed with [ST and GTD] did not have them," and that no reasonable inference of such false diagnoses may be drawn. (Doc. 52, at 26.) This argument is at odds with the language of the Amended Complaint. Indeed, a reasonable reading of that pleading reveals that it alleges numerous factual allegations that would support a determination that the patients Dr. Crumb diagnosed with ST

---

[43]     Along the way, CNI objects that "the Amended Complaint does not address or explain what makes a diagnosis 'false.'" (*Id.* at 25 n.12.) Sure it does. One need look no further than the introductory section of the Amended Complaint to discern that the Government's "false diagnosis" theory is as follows: "Dr. Crumb **knowingly falsified** diagnoses [for] over a thousand patients, representing that CNI and MMW patients suffered from rare neurological disorders of Spasmodic Torticollis … and/or Genetic Torsion Dystonia …, **when in fact the patients did not have such diagnoses**." (Doc. 34, ¶ 7(a) (emphasis added).) The pleading goes on to allege that defendants "[u]sed these false diagnoses to create a covered claim." (*Id.*) Such a theme is reiterated numerous times in the Amended Complaint. In light of these very specific allegations, defendant's reported "confusion" (doc. 52, at 25 n.12) about what the Amended Complaint means when it says a diagnosis is "false" is unwarranted.

and GTD did not actually suffer from those conditions.  Among other indicia of falsity, the Amended Complaint alleges as follows: (i) Dr. Crumb admitted "that he assigned diagnoses for the patient depending on the procedure administered on a particular date" (doc. 34, ¶ 111); (ii) when Dr. Crumb phased out Botox injection procedures, his ST/GTD diagnoses likewise declined (*id.*, ¶ 115); (iii) ST is an "uncommon diagnosis" and GTD is a "rare and disabling disorder" (*id.*, ¶¶ 86, 88); (iv) despite the infrequency of these types of dystonia, Dr. Crumb "submitted over 2,000 claims … for the treatment of low back pain with Botox injections and assigned a diagnosis of GTD or Idiopathic Dystonia" (*id.*, ¶ 92); (v) although GTD is caused by a genetic mutation that may be identified by a blood screening test, medical records do not reflect that Dr. Crumb ever ordered genetic testing or took family histories related to that disorder (*id.*, ¶¶ 88-89); (vi) Dr. Crumb used cloned documentation to describe conditions and treatments for hundreds of medical charts for patients to whom he assigned these diagnoses (*id.*, ¶¶ 93-106); (vii) many of these patients were also treated by physicians other than Dr. Crumb "who did not diagnose, treat, or even reference ST or GTD" (*id.*, ¶ 107); (viii) interviews with more than 20 patients that Dr. Crumb had diagnosed with ST or GTD revealed that none of them were aware that he had so diagnosed them, had ever even heard of these conditions, or exhibited any symptoms of same (*id.*, ¶¶ 108-09); and (ix) "Dr. Crumb was warned on numerous occasions that his medical charts did not support diagnoses of either ST or GTD" (*id.*, ¶ 249).[44]  Contrary to CNI's argument, this detailed mosaic of complementary allegations does support a reasonable

---

[44]    In its reply, CNI retorts that these allegations flunk Rule 9(b) because they do not rule out the possibility that at least some of the patients may have been validly diagnosed.  (Doc. 84, at 6-7.)  The Amended Complaint alleges extensive, detailed facts supporting with particularity the Government's theory that Dr. Crumb intentionally misdiagnosed hundreds of patients as having ST or GTD for the sole purpose of obtaining Medicare/Medicaid/TRICARE reimbursements to which he was not entitled.  In this Court's judgment, that is sufficient to plead a False Claims Act claim with the particularity required by the Federal Rules of Civil Procedure.  The theoretical possibility that some percentage of the patients identified in the Amended Complaint's sealed exhibits might actually have had ST or GTD does not compel dismissal of the Amended Complaint across the board.  Nor is the Government required affirmatively to plead that it has conducted an independent medical examination of each such patient to confirm whether that patient does or does not suffer from ST or GTD in order to satisfy threshold pleading requirements in this case.

inference that the defendant is liable for the misconduct alleged (*i.e.*, systematically making false diagnoses of ST and GTD for the purpose of creating recoverable claims for Botox injections).[45]

### G.   *Allegations of CNI's Liability for Actions of Employees.*

Shifting gears, CNI maintains that the Government's FCA claims against it should be dismissed because CNI cannot be held vicariously liable under the statute for the alleged wrongdoing of employees like Dr. Crumb.   In so doing, CNI invokes the so-called "benefit rule" applied in this Circuit to FCA claims.   Pursuant to that rule, "in cases brought under the False Claims Act … the knowledge of an employee is imputed to the corporation when the employee acts for the benefit of the corporation and within the scope of his employment."   *Grand Union Co. v. United States*, 696 F.2d 888, 891 (11th Cir. 1983) (citations omitted); *see also United States v. Route 2, Box 472, 136 Acres More or Less*, 60 F.3d 1523, 1528 (11th Cir. 1995) ("We see no reason to depart from the well established principles of corporate law that to impute knowledge to a corporation an agent must be acting within the scope of his employment and benefiting the corporation rather than acting against its benefit.").   Defendant's position, then, is that the Amended Complaint fails to allege "that any of the actions undertaken by Crumb … was undertaken for the benefit of CNI with the particularity necessary to satisfy Rule 9(b)."   (Doc. 52, at 31.)   CNI is emphatic that the Amended Complaint must "plead particularized allegations to surmount this hurdle" posed by the benefit rule.   (*Id.* at 32.)

The Court finds this argument uncompelling for two distinct reasons.   First, CNI identifies no authority for the proposition that the Government was required to plead facts supporting application of the benefit rule with the particularity required by Rule 9(b).   The benefit rule relates to scienter because it describes circumstances in which an employee's knowledge will be imputed to the corporation.   And the Eleventh Circuit has consistently noted in False Claims Act cases that scienter need not be pleaded with particularity.   *See, e.g.,*

---

[45]        In light of this detailed tapestry of factual allegations all pointing in the direction of intentionally falsified diagnoses, the Court cannot agree with CNI's characterization of the Amended Complaint as indicating that GTD "affects about 1% of the population," but providing "no other specific allegations" to support a false diagnosis theory of liability.   (Doc. 52, at 26.) Even defendant's representation that the Amended Complaint identifies GTD as afflicting 1% of the populace misreads the pleading.   On its face, the Amended Complaint asserts that dystonia – as opposed to GTD or any other particular type of dystonia – "affects about 1% of the population."   (Doc. 34, ¶ 85.)

*Urquilla-Diaz v. Kaplan University*, 780 F.3d 1039, 1051 (11th Cir. 2015) ("Rule 9(b) provides that a party alleging fraud 'must state with particularity the circumstances constituting fraud' but may allege scienter generally."); *Matheny*, 671 F.3d at 1224 ("At the pleading stage, knowledge, and other conditions of a person's mind may be alleged generally.") (citation and internal quotation marks omitted).[46]  The Court therefore rejects CNI's legally unsupported attempt to engraft the Rule 9(b) heightened pleading standard onto the benefit rule for imputing an employee's knowledge of fraud to the employing entity in an FCA case.

Second, scrutiny of the Amended Complaint reveals sufficient allegations to support a reasonable inference that Dr. Crumb's purportedly fraudulent activity was for the benefit of CNI. The Government pleads that CNI hired Dr. Crumb in the first place "[i]n an effort to maintain and expand its patient base, generate more referrals, increase MRI and X-ray orders performed at CNI Imaging, defray overhead costs, and otherwise increase overall revenue and profits." (Doc. 34, ¶¶ 72-73.)  The Amended Complaint goes on to allege that the knowledge of Dr. Crumb and the other PM&R physicians at CNI is "imputed to CNI inasmuch as the PM&R physicians acted to benefit the corporation." (*Id.*, ¶ 234.)  Such benefits were manifested in the Government's allegations that Dr. Crumb and his colleagues at CNI "assisted with patient care, covered a portion of overhead expenses, provided expertise and services beyond that which could be provided by CNI's shareholder physicians, referred patients for tests or further treatment by CNI's imaging department or shareholder physicians, accepted referrals from CNI's shareholder physicians, and provided post-surgery care for patients with complications or unsuccessful surgery outcomes." (*Id.*, ¶ 236.)  In terms of the interplay between the alleged false claims and benefit to CNI, the Amended Complaint asserts that "CNI directly received funds from claims … [for] treatment of patients for medically unnecessary Botox injections and ultrasound guidance," and that "CNI directly received funds from MRI's and X-Rays ordered by the PM&R physicians, and further realized benefits from a defray in shared overhead costs." (*Id.*, ¶ 237.)[47]  Such

---

[46]    CNI acknowledges as much in its memorandum of law in support of its Motion to Dismiss.  *See* doc. 52, at 32 ("Rule 9(b)'s heightened pleading requirement does not apply to allegations regarding intent or scienter").

[47]    Allegations such as these expose the futility of CNI's argument in its reply that the Amended Complaint fails to invoke the benefit rule because it does not allege that "the actions at issue *could* benefit CNI." (Doc. 84, at 13.)  Far more than alleging that the allegedly (Continued)

-45-

allegations are certainly sufficient at the pleadings stage to enable the Government to apply the benefit rule to impute the knowledge of Dr. Crumb and other alleged wrongdoers to CNI.[48]

### H. Scienter.

As its final ground for Rule 12(b)(6) relief, CNI contends that the Amended Complaint flunks the scienter requirement for FCA claims. This Order has already cited binding authority establishing that a plaintiff need only plead scienter generally in an FCA case. *See Urquilla-Diaz*, 780 F.3d at 1051 ("Rule 9(b) provides that a party alleging fraud 'must state with particularity the circumstances constituting fraud' but may allege scienter generally."); *Matheny*, 671 F.3d at 1224 ("At the pleading stage, knowledge, and other conditions of a person's mind may be alleged generally.") (citation and internal quotation marks omitted). Indeed, Rule 9(b) itself specifies that while the circumstances constituting fraud or mistake must be stated with particularity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Rule 9(b), Fed.R.Civ.P.

Notwithstanding these well-settled principles, CNI cites a number of non-FCA cases for the proposition that the Government in this case must "plead the factual basis which gives rise to a 'strong inference' of fraudulent intent." (Doc. 52, at 33 (citations omitted). No such pleading requirement exists in the False Claims Act context. *See, e.g., United States v. Bollinger*

---

fraudulent actions of Dr. Crumb and other CNI employees "could" benefit CNI, the Amended Complaint alleges facts supporting a reasonable inference that their allegedly fraudulent actions <u>did</u> benefit CNI because CNI "directly received funds" from those activities. That CNI may dispute the factual accuracy of such a statement is not a permissible basis for dismissing the Amended Complaint pursuant to Rule 12(b)(6).

[48] This is so, despite CNI's objection that these allegations in the Amended Complaint fail to specify the exact amounts received and/or retained by CNI, or to relate such amounts to CNI's contracts with its physician employees. (Doc. 52, at 31-32.) Without a heightened pleading requirement, such criticisms are unavailing. Moreover, in both its principal and its reply brief, CNI castigates the Government for failing to plead additional facts that it believes would show that CNI received no benefit from any such false claims. (*Id.* at 31 & n.14; doc. 84, at 13-14 & n.12.) Of course, the Government, like any other plaintiff, "is the master of the complaint." *Hill v. BellSouth Telecommunications, Inc.*, 364 F.3d 1308, 1314 (11th Cir. 2004) (citation omitted). As such, the Government was under no obligation to plead all facts known to it, and CNI's dissatisfactions on this point are of no consequence for Rule 12(b)(6) purposes. Subject only to Rule 11 and ethical constraints, there is no procedural rule or legal principle obligating a plaintiff to plead everything it knows in the complaint.

*Shipyards, Inc.*, 775 F.3d 255, 260 (5th Cir. 2014) (finding that "the district court erred by requiring the United States to plead the FCA's knowledge element with particularity" because "it need only be plead plausibly pursuant to Rule 8"); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (recognizing that under Rule 9(b), a plaintiff can "plead the requisite scienter element generally"); *Clausen*, 290 F.3d at 1309 n.15 ("We also note that the False Claims Act's command that specific intent not be proven, 31 U.S.C. § 3729(b), does not conflict with Rule 9(b), which states that intent may be averred generally."); *In re Cardiac Devices Qui Tam Litigation*, 221 F.R.D. 318, 340 (D. Conn. 2004) (because Rule 9(b) allows a plaintiff to aver intent or knowledge generally, "we decline to dismiss the three FCA counts under Rule 9(b) for failure to allege facts giving rise to a strong inference of fraudulent intent").[49] Besides, it would be incongruous to require FCA plaintiffs to plead facts supporting a strong inference of fraudulent intent, inasmuch as the FCA does not even require proof of specific fraudulent intent. *See Urquilla-Diaz*, 780 F.3d at 1058 (under the FCA, "proof of a 'specific intent to defraud' is not required"); 31 U.S.C. § 3729(b)(1)(B) (for purposes of the FCA, "the terms 'knowing' and 'knowingly' -- require no proof of specific intent to defraud").

More fundamentally, leaving aside any lingering debate as to the appropriate pleading standard for scienter in FCA cases, the Court has little trouble concluding that the Amended Complaint sufficiently pleads scienter in a manner that withstands CNI's Rule 12(b)(6) challenge. As noted, "[t]he FCA's scienter requirement does not demand specific intent to defraud and can be satisfied by proving only reckless disregard of the truth or falsity of the information." *United States ex rel. Owens v. First Kuwaiti General Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010) (citation and internal quotation marks omitted). The Eleventh Circuit has found that the FCA's "reckless disregard" standard is satisfied "when the actor knows or has reason to know of facts that would lead a reasonable person to realize that harm is the likely result of the relevant act." *Urquilla-Diaz*, 780 F.3d at 1058 (citations and internal quotation marks omitted). "Although proof of a 'specific intent to defraud' is not required, …

─────────────────────

[49] It appears that CNI's misstatement of the applicable pleading standard on this point stems from its reliance on page 33 of its principal brief on cases arising in the Second Circuit and/or in the securities law context, where courts have imposed stringent requirements for pleading intent to defraud. Those authorities do not apply here.

the statute's language makes plain that liability does not attach to innocent mistakes or simple negligence." *Id.* (citation omitted).[50]

CNI takes the position that the Amended Complaint pleads nothing more than "honest mistakes" or "mere negligence." (Doc. 52, at 35.) Review of the Amended Complaint, however, reveals that the Government has set forth 65 paragraphs of allegations (spanning nearly 11 pages) on the topic of scienter. (Doc. 34, ¶¶ 191-255.) Among other things, the Amended Complaint pleads the following: (i) CNI and others "knew that they were submitting claims … in violation of the FCA" (*id.*, ¶ 191); (ii) CNI engaged in "reckless and deliberately ignorant conduct" vis a vis claim submissions by not training or educating billing personnel, not having policies to procedures in place to receive information and updates from agencies regarding billing guidelines, and prioritizing claim payment over claim accuracy (*id.*, ¶¶ 195-202); (iii) CNI acted with reckless disregard and deliberate ignorance in paying no mind to Medicare billing and coding guidelines, ignoring Alabama Medicaid updates that notified providers of 76 modifier errors such as those being committed by CNI, and overlooking warnings from private payers about problems with CNI's billing practices (*id.*, ¶¶ 203-25); (iv) as discussed *supra*, Dr. Crumb's knowledge was imputed to CNI for purposes of the FCA's scienter requirement, and Dr. Crumb had direct and actual knowledge of the falsity of the claims he was submitting or causing to be submitted (*id.*, ¶¶ 234-50); and (v) CNI violated its own written Compliance Plan by failing to monitor or ensure compliance with the FCA and program rules and regulations, and refusing to take steps to investigate allegations of billing impropriety (*id.*, ¶¶ 251-54).

---

[50] It bears noting that no defense to FCA liability arises merely because the corporate employee certifying the integrity and validity of the claim was ignorant of the wrongful conduct committed by other corporate employees. *See, e.g., United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 479 (5th Cir. 2015) (recognizing that "courts have rejected 'ignorant certifier' defenses" and that "liability could attach to a corporation under the FCA despite the certifier's good faith belief in the validity of the certification"); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 920 n.12 (4th Cir. 2003) ("[A] corporation can be held liable under the FCA even if the certifying employee was unaware of the wrongful conduct of other employees."). Thus, for example, it is not necessary for the Government to allege that CNI billing personnel were in on the scheme, even if they were the ones who actually made the subject certifications underlying particular false or fraudulent claims.

On the strength of these and other allegations, the Court readily concludes that, at a minimum, the pleading alleges that CNI had reason to know of facts that would lead a reasonable person to realized that harm would likely result from submitting the subject claims to Medicare, Alabama Medicaid and TRICARE under these circumstances. As such, the Amended Complaint adequately pleads that CNI, at a minimum, recklessly disregarded the truth or falsity of the claims it was submitting or causing to be submitted, so as to satisfy the FCA's scienter requirement.[51]

## V. Conclusion.

The Amended Complaint is not perfect, but perfection is not the applicable pleading standard. After painstaking review, the Court readily finds that the Government has satisfied its pleading obligations under the Federal Rules of Civil Procedure. The theories of False Claims Act liability, and the factual allegations upon which they rest, are set forth in ample detail to alert the defendants in this case to the precise misconduct with which they are charged, all with sufficient indicia of reliability to protect defendants against spurious charges. Rules 8 and 9(b) require nothing more in the False Claims Act context.

For all of the foregoing reasons, it is **ordered** as follows:

1. The Government's Motion for Leave to File Amended Consolidated Reponse (doc. 82) is **granted**;

2. Defendants Dr. Crumb and MMW's request for oral argument is **denied**;

3. The Motion to Dismiss (doc. 49) filed by defendants James Crumb, M.D. and Mobility Metabolism & Wellness PC is **granted in part**, and **denied in part**. The Motion is **granted** as to the following matters: (i) given the Government's abandonment of any intent to proceed under the "false record or statement" prong of § 3729(a)(1)(G), those portions of Paragraphs 294 and 295 of the Amended Complaint are **dismissed** as to all defendants; and (ii) the portions of Count III alleging violations of the pre-FERA reverse false claims provision are **dismissed** as to all defendants. In all other respects, that Motion is **denied**;

---

[51] Given the substantial level of detail of the Amended Complaint's allegations of scienter, the Court cannot adopt CNI's characterization of the pleading as being confined to mere "conclusory assertions of intent." (Doc. 84, at 14.)

4. The Motion to Dismiss (doc. 51) filed by defendant Coastal Neurological Institute, P.C., is **denied**; and

5. Defendants are **ordered** to file answers to the Amended Complaint on or before **September 6, 2016**.

DONE and ORDERED this 23rd day of August, 2016.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE